[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 02-16333
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 1, 2004
THOMAS  K. KAHN
CLERK

D.C. Docket No. 00-01334-MD-FAM


LEONARD J. KLAY, M.D.,
CHARLES B. SHANE, M.D.,
ALL PLAINTIFFS,
PRICE PLAINTIFFS,
Price, Sessa, Katz & Yingling,
PROVIDER PLAINTIFFS, et al.,

Plaintiffs-Appellees,


versus


HUMANA, INC.,
HUMANA HEALTH PLAN, INC.,
FOUNDATION HEALTH SYSTEMS, INC.,
n.k.a. Health Net, Inc.,
PACIFICARE HEALTH SYSTEMS, INC.,
PACIFICARE OPERATIONS, INC.,
THE PRUDENTIAL INSURANCE CO. OF AMERICA,
UNITEDHEALTH GROUP, INC.,
f.k.a. United HealthCare Corp.,
UNITEDHEALTH CARE, INC.,
WELLPOINT HEALTH NETWORKS, INC.,

Defendant-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(September 1, 2004)**

Before TJOFLAT, BIRCH and GOODWIN*, Circuit Judges.

TJOFLAT, Circuit Judge:

This is a case of almost all doctors versus almost all major health maintenance organizations (HMOs), coming before us for the third time in as many years; there have been twenty-one published orders and opinions in this case from various federal courts. The plaintiffs are a putative class of all doctors who submitted at least one claim to any of the defendant HMOs between 1990 and 2002. They allege that the defendants conspired with each other to program their computer systems to systematically underpay physicians for their services. We affirm the district court's certification of the plaintiffs' federal claims, though we strongly urge the district court to revisit the definition of these classes, and reverse the district court's certification of the plaintiffs' state claims. We do not reach the district court's certification of a California Subclass since the defendants did not specifically challenge the certification on appeal.

_____

* Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

I.

The plaintiffs are physicians who were reimbursed by one or more of the defendant HMOs for treating patients covered by those HMOs. The plaintiffs allege that the backbone of their relationship with the HMOs is that they "will be paid, in a timely manner, for the covered, medically necessary services they render." Provider Plaintiffs' Second Amended, Consolidated Class Action Complaint, ¶ 4 (Sept. 19, 2002) (hereinafter, Second Complaint).[1] In a phrase that will undoubtedly play well with a jury, the doctors alliteratively claim that the defendants systematically "deny, delay and diminish the payments due to [them]," id. ¶ 5, and fail to tell doctors that they are being underpaid, id. ¶ 78. The complaint alleges that the defendants' reimbursement system is based on

> covertly denying payments to physicians based on financially expedient cost and actuarial criteria rather than medical necessity, processing physicians' bills using automated programs which manipulate standard coding practices to artificially reduce the amount they are paid, and . . . systematically delaying payments to gain increased use of the physicians' funds.

Id. ¶ 6.

If an agreement between a physician and an HMO exists, its terms govern the physician's reimbursement. The HMOs also "represent to the medical

_____

[1] We quote from the plaintiffs' second amended complaint because it sets forth the material facts of this case most clearly; the substance of the allegations is the same across all three of the plaintiffs' complaints.

3

profession at large" that when a physician treats a patient who belongs to an HMO with which the physician does not have a contract, the HMO will still reimburse him. Among the ways in which the defendants allegedly convey this information are "[b]y disseminating billing information to the profession at large," "confirming coverage for medically necessary services when contacted by doctors prior to treatment," and "explaining payments so as to make it appear that doctors are being paid for the covered, medically necessary services they render." Id. ¶¶ 77(c), (d), (f).

The complaint alleges that physicians under contract with HMOs are compensated through one of two different methods—fee-for-service or capitation. Physicians who do not have a contractual relationship with an HMO are reimbursed only under a fee-for-service regime. See id. ¶¶ 79, 101. Although the plaintiffs allege that they are being systematically underpaid under both payment methods, the exact ways in which this is purportedly accomplished differ; we will consider each reimbursement scheme in turn.

A.

Under a fee-for-service plan, an HMO agrees to reimburse doctors for any medically necessary services they perform on covered individuals, whether or not those doctors are under contract with the HMO. This gives doctors an incentive to

4

perform as many tests and procedures as they can convince the HMO are medically necessary; HMOs, in contrast, have an incentive to approve as few procedures as possible. Both parties claim they are acting in their patients' best medical interests.

To claim reimbursement, physicians are required to fill out an HCFA-1500 form, developed by the federal government and the American Medical Association. These forms employ a "current procedural terminology" coding procedure ("CPT coding") whereby medical procedures are identified by standardized designators. Each designator is comprised of two components: a "base code" that identifies the nature of the procedure and a series of modifiers "for the degree of difficulty, complexity and multiplicity." Id. ¶ 80. Each HCFA-1500 form is processed by the defendants' computer systems, which specify the amount that the physician should be paid.

The plaintiffs allege that these computer systems are programmed to systematically underpay the plaintiffs through a variety of methods. First, the plaintiffs allege that the systems are programmed to simply deny reimbursement for certain base codes that insurance companies feel are too expensive, notwithstanding their contractual obligations to both physicians and patients. Id. ¶ 84. Second, the plaintiffs allege that when the systems read certain base codes on HCFA-1500 forms, they are programmed to interpret them as requesting

5

reimbursement for less expensive procedures ("downcoding"). Id. ¶ 86. Third, the plaintiffs contend that the system is programmed to simply group certain base codes together, so that if the system reads certain combinations of codes on the forms, they will be interpreted as being only a single code ("grouping"). Id.

Fourth, the system is allegedly programmed to ignore certain modifiers that would drive up physicians' reimbursements. Id. ¶ 90. Fifth, the plaintiffs assert that the system is designed to unnecessarily put their reimbursement claims in a "state of suspense before they are processed even though no additional information is needed or requested. . . . The end result is that average payment times exceed by multiples the time provided for by law in most states as well as the time set by contract and industry practice." Id. ¶¶ 94, 96. Finally, the plaintiffs allege that the forms the HMOs send to physicians explaining the amounts of their reimbursements, called "explanation of benefits" forms ("EOBs"), "misrepresent or conceal the actual manner in which Plaintiffs' . . . payment requests were processed so as to induce them to accept reduced payments in reliance thereon." Id. ¶ 98.

### B.

Even plaintiffs whose contracts establish a capitation payment plan are not free from the defendants' alleged manipulation. Under a capitation agreement,

each patient specifies a physician as his "primary care provider." The HMO is obligated to pay each physician a small monthly fee, called a capitation payment, for each patient registered to him. The physician, in turn, is obligated to provide whatever medical services each registered patient requires. Thus, a capitation system is a flat-rate scheme in which a physician's payments are "based on the number of patients they agree to treat rather than on the services they actually render." Id. ¶ 7. A capitation method gives a physician an incentive to provide as few services as possible to each patient, whether or not medically necessary, because his payments are not tied to the quality or extent of services he provides. The HMOs, in turn, have an incentive to register as few patients as possible with each physician, so as to reduce their monthly per-patient outlays.

The plaintiffs contend that the HMOs are underpaying physicians by failing to pay capitation fees for many patients who have registered with a physician but never visited him. Id. ¶ 105. Consequently, plaintiffs allege, they are receiving capitation payments based on a much smaller pool of patients than that to which they are entitled.

This is not the only way in which the defendants have allegedly cheated doctors reimbursed under a capitation scheme. Before sending physicians their capitation payments, HMOs withhold a small amount of money to establish a

"pharmacy risk pool," which is used to pay for their insured patients' medication. The plaintiffs contend that the defendants are withholding too much from their capitation reimbursements because they are basing the withholdings on the actual cost of the drugs the patients are using, without taking into account "the substantial rebates/refunds/discounts granted by drug manufacturers." Id. ¶ 106.

The defendants are also contractually obligated to pay the plaintiffs an extra bonus if there is money left in the pharmaceutical risk fund at the end of the year after all of the patients' covered medications have been paid for. The plaintiffs allege, however, that defendants somehow "adjust" the year-end statements for the risk fund so as to avoid making these payments. Id. ¶ 107. Finally, not all services are covered by the capitation plan; for certain non-covered services, physicians are required to submit HCFA-1500 forms. The plaintiffs allege that when capitation-plan doctors submit these forms, they are subjected to the same types of fraudulent behavior as the fee-for-service doctors, discussed in the previous Section.

C.

The plaintiffs sued a variety of large HMOs because they claim that these practices are not occurring in isolation, but are instead the end-product of a decades-long nefarious conspiracy to undermine the American health care system. The plaintiffs assert that such a conspiracy was necessary to permit these practices

8

to continue, because "[i]f only one Defendant engaged in these activities, physicians could and would refuse to do business with that Defendant, but together Defendants have the power and influence necessary to affect and perpetuate their scheme." Id. ¶ 118. To support this allegation, the plaintiffs point to the fact that most of the HMOs run their reimbursement processes in substantially the same way, id. ¶ 119, and participate in various industry groups, trade associations, and standards-promulgation projects, id. ¶ 120.

D.

This case originated when lawsuits were filed in four federal judicial districts against Humana, Inc., for underpaying doctors in the manners described above. These suits were consolidated by the Judicial Panel on Multidistrict Litigation (the "Panel") in the Southern District of Florida. In re Humana Managed Care Litig., No. 1334, 2000 U.S. Dist. LEXIS 5099 (J.P.M.L. Apr. 13, 2000). Later, the Panel decided to combine the suits against Humana with several other similar federal suits from across the country filed against other major HMOs. In re Humana Managed Care Litig., Nos. 1334, 1364, 1366 & 1367, 2000 U.S. Dist. LEXIS 15927 (J.P.M.L. Oct. 23, 2000). The Panel found that these suits "involve[d] common questions of fact concerning whether defendants—either singly or as part of a conspiracy—implemented certain policies, including inter alia

9

utilization review processes, physician financial incentives, and/or failure to pay clean claims in a timely manner which . . . unlawfully interfered with health care providers' delivery of . . . care." Id. at *7-8. It further held,

> Centralization of all the actions under Section 1407 in the Southern District of Florida . . . will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Congregating all these actions there is necessary in order to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary. As a result, resolution of overlapping issues, such as class certification, any common practices, and the nature and existence of any conspiracy, will be streamlined.

Id. at *8. Separate federal proceedings against CIGNA were later consolidated into this suit in In re Managed Care Litig., 246 F. Supp. 2d 1363, 1364 (J.P.M.L. 2003).

Once the cases were consolidated, the plaintiffs filed an amended complaint against all of the defendants, see First Consolidated, Amended Class Action Complaint (Mar. 26, 2001) (hereinafter, First Complaint). It requested that the district court certify three classes. First, the plaintiffs requested certification of a Global Class, including "[a]ll medical doctors who provided services to any person insured by any defendant from August 14, 1990 to [the date of certification]," to pursue their claims that the defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), and aided and abetted each other in doing so. Id. ¶ 119 (brackets in original). Second, the plaintiffs sought

10

recognition of a National Subclass, comprised of all "[m]edical doctors who provided services to any person insured by a Defendant, when the doctor has a claim against such Defendant and is not bound to arbitrate the claim," to pursue various state-law claims against the defendants, as well as claims based on "direct" (substantive, as opposed to inchoate) RICO violations.[2] Id. ¶ 120. Finally, the plaintiffs requested certification of a California Subclass, comprised of "[m]edical doctors who provided services to any person insured in California by any defendant, when the doctor was not bound to arbitrate the claim being asserted," to pursue alleged violations of Cal. Bus. & Prof. Code § 17200. Id. ¶ 121. The district court certified all three classes, In re Managed Care Litig., 209 F.R.D. 678 (S.D. Fla. 2002), and the HMOs now appeal.

For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in

---

[2] The district court certified a Global Class, comprised of all doctors, whether or not they had arbitration clauses, to pursue RICO claims based on aiding and abetting and conspiracy because it held that such causes of action were non-arbitrable. It certified a National Subclass, comprised only of doctors not subject to enforceable arbitration clauses, to pursue the substantive RICO claims because those claims were ultimately held by the Supreme Court to be arbitrable. See PacifiCare Health Sys. v. Book, 538 U.S. 401, 407, 123 S. Ct. 1531, 1536, 155 L. Ed. 2d 578 (2003) ("[T]he proper course is to compel arbitration" of the direct RICO claims.); see also In re Managed Care Litig., MDL No. 1334, at 8 (S.D. Fla. Sept. 15, 2003) ("[A]ll direct RICO claims that stem from contractual relationships subject to arbitration must be arbitrated, notwithstanding any clauses limiting the availability of punitive, exemplary or extra-contractual damages.").

11

Federal Rule of Civil Procedure 23(a),[3] as well as at least one of the requirements

set forth in Rule 23(b).[4]  <u>City of Hialeah v. Rojas</u>, 311 F.3d 1096, 1101 (11th Cir.

---

[3]  This Rule states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

[4] This Rule states:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> > (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> >
> > > (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> > >
> > > (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> >
> > (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> >
> > (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
> >
> > > (A) the interest of members of the class in individually controlling

2002); <u>Turner v. Beneficial Corp.</u>, 242 F.3d 1023, 1025 (11th Cir. 2001).  The

classes in this case were certified under Rule 23(b)(3), which states that a class

action may be certified if "the court finds that the questions of law or fact common

to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy."

In this appeal, the defendants do not challenge the standing of the named

plaintiffs or any of the district court's findings concerning Rule 23(a); they contend

only that certification under Rule 23(b)(3) was improper.  They raise three separate

arguments.  First, they contend that common questions of law and fact concerning

the federal claims do not predominate over individual issues specific to each

plaintiff.  They next make the same argument regarding the plaintiffs' state law

claims.  Finally, for both the federal and state claims, they contend that, regardless

---

> the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
>
> (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b).

13

of whether common issues of law and fact predominate, a class action is inferior to other methods of adjudicating them. We address each of these arguments in separate Parts.

"The decision to certify is within the broad discretion of the district court . . . ." Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996). However, with great power comes great responsibility; the awesome power of a district court must be "exercised within the framework of rule 23." Id. We apply an abuse of discretion standard in reviewing the district court's class certification rulings. Hines v. Widnall, 334 F.3d 1253, 1255 (11th Cir. 2003).

> A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner. Finally, an abuse of discretion occurs if the district court imposes some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to anyone else or society at large. In making these assessments, we review the district court's factual determinations for clear error, and its purely legal determinations de novo.

Klay v. United Healthgroup, Inc., No. 02-16640, U.S. App. LEXIS 13492 (11th Cir. June 30, 2004) (quotation marks and citations omitted).


II.

The defendants' first claim is that the district court erred in certifying a

14

Global Class to pursue federal RICO claims based on conspiracy and aiding-and-abetting, and a National Class to pursue federal claims based on "direct" RICO violations, because the common issues of fact and law these claims involve do not predominate over individualized issues. Section A explains the substance of the plaintiffs' RICO claims in order to determine the issues of fact and law that are implicated. Section B analyzes our circuit's precedents concerning whether common issues of fact and law predominate over individualized ones under Rule 23(b)(3). Section C applies these principles to the RICO claims in this case, concluding that the district court did not abuse its discretion in certifying classes to litigate these claims. Finally, although we conclude that the district court acted within the proper scope of its power, Section D offers an observation that we strongly urge the court to consider in potentially redefining the scope of these classes.

A.

To understand the plaintiffs' RICO claims, it is necessary to first examine two of the central elements upon which they are predicated—the "pattern of racketeering activity" in which the defendants allegedly engaged, and the "enterprise" to which this racketeering activity was allegedly related. To violate RICO, a defendant must engage in a pattern of racketeering activities. RICO designates the violation of certain federal criminal laws as "racketeering activities,"

15

see 18 U.S.C. § 1961(1).  The plaintiffs contend that the defendants committed racketeering activities by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; extortion, in violation of 18 U.S.C. §§ 1951(a) and (b)(2); and violations of the Travel Act, 18 U.S.C. § 1952(a)(3).[5]

The defendants allegedly committed mail and wire fraud by withholding from the plaintiffs information concerning the various practices described above in Sections I.A and I.B.  For example, the plaintiffs allege that the "Defendants misrepresented to Plaintiffs and class members that Defendants would pay Plaintiffs and class members for medically necessary services and procedures according to the CPT codes for the services and procedures they provided."  First Complaint ¶ 236.  The plaintiffs further contend that the defendants "have concealed and have failed to disclose that they deliberately delay payments . . . [and] that they have developed or purchased claims systems designed to manipulate CPT codes."  Id. ¶ 239, 241.  Regarding doctors reimbursed under a capitation plan, the plaintiffs maintain that the defendants "have represented that capitation payments are paid upon enrollment of members [and] . . . have failed to disclose their use of age/sex adjustment factors to adjust capitation payments

---

[5]  The plaintiffs originally alleged that the defendants also engaged in racketeering activity by interfering with benefit plans in violation of 18 U.S.C. § 1954.  See First Complaint ¶¶ 264-67.  This allegation was dropped from the Third Amended, Consolidated Class Action Complaint (Nov. 25, 2002), so we need not consider it.

below the levels the Defendants agreed to pay." Id. ¶¶ 245-46.

The defendants allegedly engaged in extortion by

> forc[ing] Plaintiffs and members of the class to accept capitation
> contracts, accept the loss of compensation for treating Defendants'
> insureds which results from their misrepresentation and manipulation
> of the workings of the capitation payment system, and accept the
> denial, reduction and delay of payments for covered, medically
> necessary services . . . through fear of economic loss. Defendants
> create this fear through threats, both veiled and explicit, that doctors
> will lose the patient base Defendants control, be blacklisted, and in the
> case of noncontract doctors, not be paid at all.

Third Amended, Consolidated Class Action Complaint ¶¶ 150-51 (Nov. 25, 2002)

(hereinafter, Third Complaint).[6]

The final racketeering activity in which the defendants allegedly engaged

was violating the Travel Act, which makes it a crime to "travel[] in interstate or

foreign commerce or use[] the mail or any facility in interstate or foreign

commerce, with intent to . . . promote, manage, establish, carry on or facilitate the

promotion, management, establishment, or carrying on, of any unlawful activity."

18 U.S.C. § 1952(a)(3). The defendants purportedly used "the mail or other

---

[6] The district court's class certification decision was, of course, based on the First Complaint. However, we will base our class certification ruling on the Third Complaint—apparently the most recent complaint filed in this case—when it pleads a claim better than the First Complaint, for the sake of judicial economy. If we reversed the district court's certification of a class concerning a particular claim as it is pled in the First Complaint, even though that class might have been certified based on the pleadings in the Third Complaint, we would be engendering much unnecessary litigation. Thus, even though the district court did not formally rule upon the Third Complaint, we will take it into account when it better repleads claims that the district court adjudicated from the First Complaint. As discussed later, however, this ruling does not address counts that are raised for the first time in the Third Complaint.

17

facilities of interstate commerce . . . to carry on their extortion" as described above. Third Complaint ¶ 154.

Having laid out the various racketeering activities in which the defendants allegedly engaged, we now turn to the enterprise to which these activities were ostensibly related. The plaintiffs assert that the defendants belonged to a shadowy, mysterious "Managed Case Enterprise" that included other health insurance companies not named as defendants, the companies that developed the claims-processing software the defendants use, companies that review claims for the defendants, and several trade, standards-setting, and industry organizations and associations to which the defendants belong or with which the defendants work. This enterprise is a "system that allows [the defendants] to manipulate and control reimbursements to physicians and conceal the manner in which that is done." Third Complaint ¶ 138.

Based on these facts, the plaintiffs allege several different RICO violations. First, they contend that the defendants violated 18 U.S.C. §§ 1962(a) and (c) (Counts III and IV in the First Complaint; Count III in the Third Complaint). Section 1962(a) makes it unlawful for "any person who has received any income, derived directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income . . . [in the] operation of, any enterprise which is engaged in . . . interstate . . . commerce." The defendants

18

allegedly violated this provision by using money they obtained through racketeering activities—that is, underpaying doctors through the dishonest means specified in Sections I.A and I.B, thereby violating the federal criminal laws specified above—to further the Managed Care Enterprise.

18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The plaintiffs assert that the defendants operated the Managed Care Enterprise by engaging in racketeering activity because the enterprise itself was created to systematically underpay doctors for the services they provide.

Next, the plaintiffs contend that the defendants violated 18 U.S.C. § 1962(d), which prohibits conspiracies to violate other provisions of RICO by conspiring with each other to violate 18 U.S.C. §§ 1962(a) and (c), as discussed above. (Count I in both the First Complaint and Third Complaint). The plaintiffs further assert that the defendants violated 18 U.S.C. § 2 by aiding and abetting each other in violating 18 U.S.C. §§ 1962(a) and (c), as discussed above. (Count II in both the First Complaint and Third Complaint). Finally, based on these allegations, the plaintiffs seek injunctive and declaratory relief. (Count X in the First Complaint; Count IV in the Third Complaint). Having explained the federal claims for which

19

the plaintiffs sought class certification, we now explore the "predominance" analysis mandated by Rule 23(b)(3).

B.

The defendants' main contention is that the district court erred in certifying classes to litigate the RICO claims discussed above because the common issues of fact and law these claims involve do not predominate over the individualized issues involved that are specific to each plaintiff. Under Rule 23(b)(3), "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." In re Theragenics Corp. Secs. Litig., 205 F.R.D. 687, 697 (N.D. Ga. 2002). In determining whether class or individual issues predominate in a putative class action suit, we must take into account "the claims, defenses, relevant facts, and applicable substantive law," Castano, 84 F.3d at 744, to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant.[7]

---

[7] In determining whether individual or collective issues predominate, we look not only to the plaintiff's allegations, but also to any compulsory counterclaims that the defendant can be expected to bring or permissive counterclaims that the defendant has already brought. See Heaven v. Trust Co. Bank, 118 F.3d 735, 738 (11th Cir. 1997) (rejecting class certification in part because the class members, as "counterclaim defendants[,] would be compelled to come forward with individual defenses" that would "require the court to engage in multiple separate factual determinations"). We do not, however, take into account permissive counterclaims that the defendant has yet to bring because it is possible they will not actually be brought and the district court can reconsider its certification decision once they have been filed. See Roper v. Consurve, Inc., 578 F.2d 1106, 1116 (5th Cir. 1978); see also Bonner v. City of Prichard, 661

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Rutstein v. Avis Rent-A-Car Sys., 211 F.3d 1228, 1234 (11th Cir. 2000). Common issues of fact and law predominate if they "ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." Ingram v. Coca-Cola Co., 200 F.R.D. 685, 699 (N.D. Ga. 2001). Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3). See Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 273 (S.D. Fla. 2003) (declining class certification in part because "any efficiency gained by deciding the common elements will be lost when separate trials are required for each class member in order to determine each member's

F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981); Brown v. SCI Funeral Servs. of Fla., Inc., 212 F.R.D. 602, 607 (S.D. Fla. 2003) ("[I]f the Court, following certification, concludes that the counterclaims make the class unmanageable, the Court has the continuing authority under Rule 23 to issue a supplemental order excluding counter-claim defendants from the plaintiff class . . . ."). Indeed, even where a defendant files a counterclaim, he must adduce some evidence in support of it before a court will take it into account as a reason for declining to certify a class. The defendants in this case have not pointed to any permissive counterclaims they have already filed, or compulsory counterclaims they are likely to file, against substantial numbers of class members. Consequently, in determining whether individual or collective issues predominate in this class action, we consider only the evidentiary and legal issues arising from the allegations contained in the complaint and the defenses raised against them.

21

entitlement to the requested relief").

An alternate formulation of this test was offered in <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309 (5th Cir. 1978). In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." <u>Id.</u> at 322. Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. <u>Id.</u> ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

## C.

In certifying the plaintiffs' RICO claims, the district court found that common questions of fact and law predominate because this case "involves a conspiracy and joint efforts to monopolize and restrain trade." <u>Managed Care Litig.</u>, 209 F.R.D. at 696. The common factual issues that predominated over individualized ones included

22

Defendants' medical necessity requirements, Defendants' use of actuarial guidelines, Defendants' use of automated claims system and comparable software capable of adjusting CPT codes and reimbursement rates and automatically delaying and denying claims as well as other uniform activities designed to deny, delay or decrease reimbursement or payments to physicians.

Id. The existence of a conspiracy, and whether the defendants aided and abetted each other, were also issues common to all of the plaintiffs that tended to predominate. Id. We agree with this analysis.

1.

The plaintiffs here allege the type of nationwide conspiracy which we intimated in Blue Bird Body Co., 573 F.2d 309, would probably be appropriate for nationwide class certification. In that case, the State of Alabama sought to represent a nationwide class of all governmental entities in the United States that purchased school buses, alleging that the defendants engaged in a nationwide price-fixing conspiracy in violation of federal antitrust laws. The only evidence to which the plaintiffs pointed to support their claims of a nationwide conspiracy, however, was an excerpt from a deposition that referred solely to price-fixing within Alabama. We recognized that the plaintiffs might have intended to establish proof of a nationwide conspiracy "through testimony, exhibits, etc., of the various school bus markets on a state by state basis." Id. at 322. We held,

If this is indeed the plaintiffs' plan, then the national class should not have been certified since there would be no evidence linking the

23

> different conspiracies to each other in order to establish the one
> "common" conspiracy. Common issues of fact do not predominate in
> such a situation even though all the plaintiffs might have separate
> causes of actions against the same defendants based upon similar
> theories of recovery.

Id. at 323 (footnote omitted). In this case, in contrast, all of the defendants operate

nationwide and allegedly conspired to underpay doctors across the nation, so the

numerous factual issues relating to the conspiracy are common to all plaintiffs. Cf.

Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 (11th Cir. 1987) (granting

class certification because "each of the complaints alleges a single conspiracy and

fraudulent scheme against a large number of individuals and thus is particularly

appropriate for class action" (quotation marks and citation omitted)).

This case stands in stark contrast to many others in which we found

individualized issues to predominate. For example, in Jackson v. Motel 6

Multipurpose, Inc., 130 F.3d 999 (11th Cir. 1997), a putative class of African-

American plaintiffs sued Motel 6, alleging that the chain either denied African-

Americans accommodations altogether, or rented them only dirty rooms. We

declined to certify the class because the plaintiffs' claims would have "require[d]

distinctly case-specific inquiries into the facts surrounding each alleged incident of

discrimination." Id. at 1006. We explained:

> The issues that must be addressed include not only whether a
> particular plaintiff was denied a room or was rented a substandard
> room, but also whether there were any rooms vacant when that

24

plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he requested a room, exhibited any non-racial characteristics legitimately counseling against renting him a room; and so on . . . . These issues are clearly predominant over the only issue arguably common to the class—whether Motel 6 has a practice or policy of racial discrimination.

Id.

We came to the same conclusion in Rutstein, 211 F.3d 1228, where we denied class certification to a group of plaintiffs alleging that Avis refused to establish corporate accounts for Jewish companies. We held that each plaintiff's individualized allegations necessarily predominated over the issue of whether Avis had discriminatory policies because "[e]ach plaintiff [would] have to bring forth evidence demonstrating that the defendant had an intent to treat him or her less favorably because of the plaintiff's Jewish ethnicity." Id. at 1235. We explained that individual claims for discrimination are inextricably bound up in innumerable case-specific facts, for "even if [the] plaintiffs [could] demonstrate that a general policy or practice of discrimination was applied in their cases, Avis [could] escape liability by showing that an individual plaintiff would have been denied or terminated even if no such policy or practice had existed." Id. at 1236.

The individual issues that must be addressed [regarding each individual plaintiff] include not only whether Avis actually denied a particular plaintiff a corporate account, gave the plaintiff a less advantageous account, or cancelled the plaintiff's account, but also

25

whether the particular plaintiff was of the age required by Avis to qualify for a corporate account; whether the plaintiff met the financial criteria for a corporate account; whether the nature of the plaintiff's expected use of Avis vehicles would make the transaction cost-justified for Avis; whether the plaintiff would be renting cars from Avis in a criminally high-risk or low-risk geographical area; whether the Avis employee who allegedly denied the plaintiff a corporate account judged the caller-applicant to be lying about his or her qualifications based on information not related to the caller's ethnicity; and so on, and so on. All of these issues are clearly case-specific, and they will all have to be addressed in one way or another in order for each plaintiff to demonstrate a prima facie case of intentional discrimination.

Id. at 1235.

Motel 6 and Rutstein were both cases in which individuals were seeking to litigate separate discrimination claims that arose from a variety of individual incidents together in the same class action simply because they alleged that the acts of discrimination occurred pursuant to corporate policies. In the instant case, however, the plaintiffs' RICO claims are not simply individual allegations of underpayments lumped together, and the allegation of an official corporate policy or conspiracy is not simply a piece of circumstantial evidence being used to support such individual underpayment claims. Instead, the very gravamen of the RICO claims is the "pattern of racketeering activities" and the existence of a national conspiracy to underpay doctors. These are not facts from which jurors will be asked to infer the commission of wrongful acts against individual plaintiffs; these very facts constitute essential elements of each plaintiff's RICO claims.

26

While the existence of a policy of discrimination did not constitute an element of any of the causes of action in <u>Rutstein</u> or <u>Motel 6</u>, the existence of a general conspiracy to violate certain federal laws, or a pattern and practice of aiding and abetting other HMOs' violations of those laws, is an essential element of each individual plaintiff's RICO-related claims. Cf. <u>Rutstein</u>, 211 F.3d at 1235 ("Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class."). Thus, while corporate policies were only circumstantially relevant in the discrimination cases, and insufficient to overcome the tremendous individualized issues of fact that remained in those cases, they constitute the very heart of the plaintiffs' RICO claims here, and would necessarily have to be re-proven by every plaintiff if each doctor's claims were tried separately.

2.

The defendants contend that class certification is inappropriate because the RICO claims are based, in large part, on allegations of mail and wire fraud. Under <u>Sikes v. Teleline, Inc.</u>, reliance may not be presumed in fraud-based RICO actions; instead, the evidence must demonstrate that each individual plaintiff actually relied upon the misrepresentations at issue. 281 F.3d 1350, 1360, 1362 (11th Cir. 2002) (holding that, to make out a civil RICO claim based on mail or wire fraud, a

27

plaintiff must demonstrate that he "relied on a misrepresentation made in furtherance of [a] fraudulent scheme" because "[i]t would be unjust to employ a presumption to relieve a party of its burden of production when that party has all the evidence regarding that element of the claim"). The defendants contend that, because each individual plaintiff must specifically show that he, personally, relied on the misstatements at issue, this individualized issue necessarily predominates.

The Fifth Circuit, in Castano, 84 F.3d at 745 (which is not binding upon us), held that, under Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880 (5th Cir. 1973) (citations omitted) (which is binding on us), "a fraud class action cannot be certified when individual reliance will be an issue." This is a misinterpretation of Simon, which in fact stated only that

> [i]f there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. . . . [I]f the writings contain material variations, emanate from several sources, or do not actually reach the subject investors, they are no more valid a basis for a class action than dissimilar oral representations.

Simon, 482 F.2d at 882. As this quote demonstrates, we declined certification in Simon because of the plaintiff's "failure to prove any standardized representations by [the defendant]." Id. at 883. In this case, however, the plaintiffs allege that while the defendants engaged in a variety of specific communications with physicians, they all conveyed essentially the same message—that the defendants

28

would honestly pay physicians the amounts to which they were entitled.

Under well-established Eleventh Circuit precedent, the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification. In Kirkpatrick, 827 F.2d at 720, for example, the plaintiffs sought class certification of their claim that various brokerage firms "disseminat[ed] materially misleading information" concerning the financial condition of a company in which the plaintiffs had purchased limited partnership interests. Among the provisions under which the plaintiffs sought recovery was Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under the Securities and Exchange Act of 1934, 15 U.S.C. § 78j. We reversed the district court's order denying certification under Rule 23(b)(3), concluding that common issues of fact and law predominated over individual issues. The district court's main concern was that each of the plaintiffs was individually obligated to demonstrate his or her reliance on the defendants' misstatements to make out claims under Rule 10b-5. We held, however,

> In view of the overwhelming number of common factual and legal issues presented by plaintiffs' misrepresentation claims, . . . the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment. Here, . . . each of the complaints alleges a single conspiracy and fraudulent scheme against a large number of individuals and thus is particularly appropriate for class action.

Kirkpatrick, 827 F.2d at 724-25 (quotation marks and citation omitted).

29

We follow <u>Kirkpatrick</u> here for two reasons. First, the common issues of fact discussed in the previous Section, concerning the existence of a national conspiracy, a pattern of racketeering activity, and a Managed Care Enterprise, are quite substantial. They would tend to predominate over all but the most complex individualized issues.

Second, while each plaintiff must prove his own reliance in this case, we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations.

The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds, and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts. While the EOB forms may raise substantial individualized issues of reliance, the antecedent representations about the defendants' reimbursement practices do not. It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due. A

30

jury could quite reasonably infer that guarantees concerning physician pay—the very consideration upon which those agreements are based—go to the heart of these agreements, and that doctors based their assent upon them. This is a far cry from the type of "presumed" reliance we invalidated in Sikes. Consequently, while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue). For this reason, this is not a case in which individualized issues of reliance predominate over common questions.

3.

The defendants point out that individualized determinations are necessary to determine the extent of damages allegedly suffered by each plaintiff. While this is undoubtedly true, it is insufficient to defeat class certification under Rule 23(b)(3). "[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003), reh'g en banc denied, 362 F.3d 739 (11th Cir. 2004); see, e.g., In re Tri-State Crematory Litig., 215 F.R.D. 660, 692 n.20 (N.D. Ga. 2003) ("The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class.").

"[I]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all. . . . [Plaintiffs] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis." In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. 672, 698 (S.D. Fla. 2004) (quotation marks omitted). Particularly where damages can be computed according to some formula,[8] statistical analysis,[9] or other easy or essentially mechanical methods,[10] the fact that damages must be calculated on an individual basis is no impediment to class certification.

It is primarily when there are significant individualized questions going to liability exist that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification. See, e.g., Sikes, 281 F.3d at 1366 ("These claims will involve extensive individualized inquiries on the issues of injury and

---

[8] E.g., In re Terazosin Hydrochloride Antitrust Litig., 203 F.R.D. 551, 559 (S.D. Fla. 2001) (upholding class certification where the plaintiffs offered an "algebraic formula for the computation of class members' overcharge damages" despite the fact that "the jury will also have to consider some individualized evidence in rendering individual damage calculations").

[9] See Pickett v. IBP, Inc., No. 96-A-1103-N, 2001 U.S. Dist. LEXIS 22453, at *35 (M.D. Ala. Dec. 26, 2001) ("[I]f damages can be computed using 'statistical techniques, the existence of individualized damage claims does not pose a barrier to certification.'" (quoting Moore's Federal Practice § 23.49[5][b])).

[10] E.g., Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978) ("While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance. It will not be necessary to hear evidence on each claim.").

damages—so much so that a class action is not sustainable."); Rutstein, 211 F.3d at 1234, 1240 (declining to certify a class because "most, if not all, of the plaintiffs' claims will stand or fall . . . on the resolution of . . . highly case-specific factual issues" and "liability for damages is a necessarily individualized inquiry"). Of course, there are also extreme cases in which computation of each individual's damages will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable, see, e.g., Windham v. Am. Brands, Inc., 565 F.2d 59, 70 (4th Cir. 1977) ("The district court estimated—conservatively, we think—that in the absence of a practical damage formula, determination of individual damages in this case could consume ten years of its time. The propriety of placing such a burden on already strained judicial resources seems unjustified."), but we emphasize that such cases rarely, if ever, come along.

In this case, even though individualized damage inquiries are necessary, many of them can be accomplished simply through reference to the HCFA-1500 forms or the HMO's records of which patients registered with doctors who are reimbursed through a capitation system. Cf. Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978) ("While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance."). In addition, even if many plaintiffs' claims require

corroboration and individualized consideration, such inquiries are outweighed by the predominating fact that the defendants allegedly conspired to commit, and proceeded to engage in, a pattern of racketeering activities to further their Managed Care Enterprise. It is ridiculous to expect 600,000 doctors across the nation to repeatedly prove these complicated and overwhelming facts.

D.

Because we are reviewing the district court's certifications under an abuse of discretion standard, we affirm. Nevertheless, it seems that the plaintiffs could comfortably be split into two Subclasses based on their reimbursement scheme: those operating on a fee-for-service basis and those with capitation contracts. While the existence of the conspiracy is equally relevant to both groups of plaintiffs, it seems that the capitation providers' claims revolve around some additional common issues that are not relevant to the fee-for-service providers. Moreover, because the capitation providers' primary allegation is that the HMOs did not pay them for all the patients actually registered to them, their individualized damage inquiries seem to be limited to an examination of the HMOs' records, and do not require as much potentially in-depth analysis as the fee-for-service providers' claims. Because this issue was not raised on appeal, however, we leave it to the district court to consider in the first instance whether the creation of these Subclasses might be a superior way of proceeding.

34

III.

The First Complaint contained five state-law claims.  In the plaintiffs' Third Complaint, one of the original state law claims (Count V of the First Complaint, quantum meruit) was dropped, and four additional state-law claims were added (Counts VIII, IX, XI, and XII of the Third Complaint).  Because the quantum meruit claim is no longer an issue in this lawsuit, we vacate the district court's grant of class certification regarding that issue.  Similarly, because the district court order being appealed did not address the additional state law claims raised for the first time in the Third Complaint, there is nothing for us to review about them.  Consequently, we focus on the four remaining state law claims raised in the First Complaint.  Section A addresses the breach of contract claims, Section B discusses unjust enrichment, Section C turns to alleged violations of state prompt-pay statutes, and Section D considers the district court's certification of a subclass concerning alleged violations of California law.

A.

The plaintiffs' breach of contract claims (Count VI in the First Complaint; Count V in the Third Complaint) are not amenable to class certification under Rule 23(b)(3) because, although they are based on questions of contract law that are common to the whole class, the individualized issues of fact they entail will probably predominate.  These claims allege that "Defendants have breached their

35

obligation to pay Plaintiffs and class members for medically necessary services in accordance with their contractual obligations." First Complaint ¶ 335.

"In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." Castano, 84 F.3d at 741. It goes without saying that class certification is impossible where the fifty states truly establish a large number of different legal standards governing a particular claim. See Sikes, 281 F.3d at 1367 n.44 ("Assuming that the district court was correct in ruling that the laws of all fifty states apply, that alone would render the class unmanageable."); Andrews v. Am. Tel & Tel. Co., 95 F.3d 1014, 1024 (11th Cir. 1996) ("The appellants cite the need to interpret and apply the gaming laws of all fifty states to assess the legality of each 900-number program as foremost among the difficulties in trying the gambling claims on a class basis, and we agree."); Kirkpatrick, 827 F.2d at 725 (upholding the district court's denial of class certification because "the state law claims would require application of the standards of liability of the state in which each purchase was transacted"). But see In re St. Jude Med., Inc., MDL No. 01-1396, 2004 U.S. Dist. LEXIS 149, at *12 (D. Minn. Jan. 5, 2004) ("[T]he Court is not convinced that it is per se impossible to certify and successfully try a class action involving the laws of 50 states . . . .").

On the other hand, if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility. See In re Terazosin

36

Hydrochloride Antitrust Litig., 220 F.R.D. 672, 695 (S.D. Fla. 2004) (noting that because "the essential elements of [the plaintiffs'] antitrust claims do not vary significantly from state-to-state, . . . they are susceptible to proof using common evidence"). In In re GMC Pick-Up Truck Fuel Tank Products Liability Litigation, for example, the Third Circuit held that class certification was appropriate because "we cannot conceive that each of the forty-nine states (excluding Texas) represented here has a truly unique statutory scheme . . . ." 55 F.3d 768, 818 (3d Cir. 1995); cf. Simon, 482 F.2d at 883 (declining class certification in part because "the geographical dispersion of the alleged representations would bring into issue various state common law standards. With no single law governing the entire class, common issues of law cannot be shown to warrant Rule 23 treatment.").

Similarly, if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate. See, e.g., Krell v. Prudential Ins. Co. of Am., 148 F.3d 283, 315 (3d Cir. 1998) ("Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit."); Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (holding that class certification is appropriate where "variations [in state law] can be effectively managed through

37

creation of a small number of subclasses grouping the states that have similar legal doctrines"). In such a case, of course, a court must be careful not to certify too many groups. "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law . . . ." In re Am. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996).

The burden of showing uniformity or the existence of only a small number of applicable standards (that is, "groupability") among the laws of the fifty states rests squarely with the plaintiffs. Walsh, 807 F.2d at 1017 ("[T]o establish commonality of the applicable law, nationwide class action movants must credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles.") (quotation marks omitted); Powers v. Gov't Employees Ins. Co., 192 F.R.D. 313, 318-19 (S.D. Fla. 1998) ("To certify a multi-state class action, a plaintiff must prove through 'extensive analysis' that there are no material variations among the law of the states for which certification is sought. If a plaintiff fails to carry his or her burden of demonstrating similarity of state laws, then certification should be denied.") (citation omitted); cf. Carnegie v. Household Int'l, Inc., 220 F.R.D. 542, 549 (N.D. Ill. 2004) (declining class certification because "[i]f the laws of the fifty states all follow one of a small number of identical standards, [the named plaintiff] has not made any attempt to prove that this is the case").

In this case, the plaintiffs allege that the only real legal issue pertinent to their breach of contract claims is the definition of "breach," which does not differ from state to state. Judge Marcus once held, "Whether [a] contract[] . . . has been breached is a pure and simple question of contract interpretation which should not vary from state to state." Indianer v. Franklin Life Ins. Co., 113 F.R.D. 595, 607 (S.D. Fla. 1986), overruled in part on other grounds by Ericsson GE Mobile Communs., Inc. v. Motorola Communs. & Elecs., Inc., 120 F.3d 216, 219 n.12 (11th Cir. 1997); accord Leszczynski v. Allianz Ins., 176 F.R.D. 659, 672 (S.D. Fla. 1997); see also Kleiner v. First Nat'l Bank of Atlanta, 97 F.R.D. 683, 694 (N.D. Ga. 1983) ("The application of various state laws would not be a bar where, as here, the general policies underlying common law rules of contract interpretation tend to be uniform."). Based on "genius, general knowledge and previous information," Penn. Nat'l Mut. Cas. Ins. Co. v. Barnett, 445 F.2d 573, 575-76 (5th Cir. 1971), we are inclined to agree. A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey. See Black's Law Dictionary 200 (8th ed. 2004) (defining "breach of contract" as "[v]iolation of a contractual obligation by failing to perform one's own promise").

Moreover, while the plaintiffs' breach of contract claims necessarily implicate the contract law of all fifty states (since members of the putative class

39

practice in every jurisdiction in the country), the defendants fail to argue on appeal that there are any relevant differences in the applicable laws among these jurisdictions. Their brief fails to point to any material differences among state laws addressing breaches of contract. Cf. In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-01 (7th Cir. 1995) (declining class certification because the laws of the several states concerning "negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause" differed sufficiently from each other that they could not be consolidated into one or a few standards). Consequently, we accept the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues in this case.

While this relatively simple issue of law is common to all the breach of contract claims, it is far outweighed by the individualized issues of fact pertinent to these claims. The plaintiffs contend that all of the agreements at issue require that doctors be reimbursed at a "reasonable rate" for the "medically necessary" services they provide. We nevertheless recognize that this case involves the actions of many defendants over a significant period of time and that each defendant throughout this period utilized many different form contracts. Indeed, each defendant contracted with different types of care-providing entities, including individual physicians, partnerships, medical practice groups, and the like, each of

40

which necessitated a different type of contract. The sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate; this is not a situation in which all plaintiffs signed the same form contract. See Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 340 (4th Cir. 1998) ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts."); cf. Kleiner, 97 F.R.D. at 692 ("When viewed in light of Rule 23, claims arising from interpretations of a [single] form contract appear to present the classic case for treatment as a class action . . . ."). The plaintiffs might be able to establish by admission, stipulation, or judicial finding of undisputed fact that, notwithstanding their differences in form or language, all the contracts at issue call for "reasonable compensation" for "medically necessary services." See Kleiner, 97 F.R.D. at 694-95 ("[A]t this point[,] the fact that not all contracts are identical is not sufficient to overcome the apparent commonality of issues that they present."). Even assuming, however, that this is a common fact, it, along with the common legal issue of what constitutes a "breach" under state law, is dwarfed by the individualized issues of fact to be resolved.

The facts that the defendants conspired to underpay doctors, and that they programmed their computer systems to frequently do so in a variety of ways, do nothing to establish that any individual doctor was underpaid on any particular

41

occasion.  See Rutstein, 211 F.3d at 1235 ("Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class."); Motel 6, 130 F.3d at 1006 (holding that plaintiffs alleging racial discrimination had failed to show "predominance" because proof concerning the existence of a general policy of racial discrimination does not show whether any individual plaintiff was actually discriminated against); Ramirez v. DeCoster, 194 F.R.D. 348, 353 (D. Me. 2000) (holding that plaintiffs "do not necessarily satisfy the requirement that questions of law or fact predominate merely by alleging a pattern or practice claim").  The evidence that each doctor must introduce to make out each breach claim is essentially the same whether or not a general conspiracy or policy of breaching existed.  For example, regardless of whether facts about the conspiracy or computer programs are proven, each doctor, for each alleged breach of contract (that is, each alleged underpayment), must prove the services he provided, the request for reimbursement he submitted, the amount to which he was entitled, the amount he actually received, and the insufficiency of the HMO's reasons for denying full payment.  There are no common issues of fact that relieve each plaintiff of a substantial portion of this individual evidentiary burden.  Cf. Terazosin Litig., 220 F.R.D. at 694 ("[W]hen there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since

42

such proof obviates the need to examine each class member's individual position, the predominance test will be met.") (quotation marks omitted). While allegations concerning the defendants' conspiracy to underpay doctors, or their policy of and aiding and abetting each other in underpaying doctors, went directly to material elements of each individual plaintiff's RICO claim, here they are, at best, merely circumstantial evidence tangentially relevant to each individual plaintiff's breach of contract claim.

Another crucial reason why the plaintiffs cannot establish predominance of classwide facts on their breach of contract claims is that, although each of the defendants allegedly breached their contracts in the same general ways, they did so through a variety of specific means that are not subject to generalized proof for a large number of physicians. See Andrews, 95 F.3d at 1023 (rejecting class certification because while "at a general level, the predominant issue presented . . . is whether the appellants were involved in the operation of illegal gambling schemes[,] . . . . as a practical matter, the resolution of this overarching common issue breaks down into an unmanageable variety of individual legal and factual issues"). For example, the plaintiffs claim that the defendants often grouped together separate procedures specified on HCFA-1500 forms submitted by doctors, frequently reimbursing them for only one of the procedures actually performed. If the plaintiffs were able to prove that the billing programs automatically grouped

together the first and second procedures specified on the HCFA-1500 form, regardless of what they were, paying doctors only for the first, then the breach of contract issue would be subject to generalized proof. After establishing that the computer program worked in this way, the doctors would be able to simply submit their HCFA-1500 forms to the court for an easy determination of damages; no further evidence of breach would be necessary.

This is not the type of allegation the plaintiffs make, however. The algorithms by which the computer programs allegedly groups procedures appear to be much more varied and complicated than this. Instead of applying one specific universal rule to cheat all doctors (e.g. automatically deducting $100 from everyone's claim), the reimbursement programs are instead alleged to apply a variety of more individually tailored rules, each of which applies to only a subset of the plaintiff class. For example, if the doctors proved that the programs automatically grouped together all lung transplants with all heart transplants, reimbursing all doctors who submitted a claim for both only for heart transplants, this fact would be irrelevant to the breach of contract claims of most members of the plaintiff class. Instead, such proof would be relevant only to those doctors who submitted a reimbursement request for both a heart transplant and lung transplant on the same patient.

For this reason, proof of any given algorithm concerning grouping would be

relevant to only a handful of doctors within the class; separate subclasses would have to be established for each allegedly improper grouping formula. The various methodologies employed by these programs "cannot be lumped together and condemned or absolved en masse." Andrews, 95 F.3d at 1024. This is a case in which "numerous plaintiffs suffer varying types of injury . . . through different causal mechanisms, thereby creating many separate issues." Watson v. Shell Oil Co., 979 F.2d 1014, 1023 (5th Cir. 1992), reh'g granted, 990 F.2d 805 (5th Cir. 1993), appeal dismissed, 53 F.3d 663 (5th Cir. 1994). "No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant." In re Northern District of California, Dalkon Shield IUD Prods. Liability Litig., 693 F.2d 847, 853 (9th Cir. 1982).

The same reasoning applies to the plaintiffs' claim that the programs used by the defendants sometimes improperly drop modifiers from doctors' reimbursement requests. For example, a doctor could include a modifier claiming that a particular procedure was "complex," entitling the doctor to greater payment. The plaintiffs allege that the computer systems sometimes improperly drops the modifier, paying the doctor for a "standard" rather than a "complex" procedure, meaning that he receives less than the full amount to which he is entitled.

Because the program does not always automatically drop all modifiers, however, or always ignore a particular modifier under a set of circumstances

applicable to most or all applicants (e.g., if it automatically dropped modifiers whenever the total amount of reimbursement sought in a claim was over $200), this allegation is not susceptible to classwide proof. Even if the plaintiffs were to prove that the computer systems "sometimes" improperly drops "certain" modifiers, this fact would do nothing to further any of the plaintiffs' individual breach of contract claims. Each plaintiff would still have to establish that he submitted a claim containing a modifier warranting increased payment, that use of the modifier was justified in that particular situation, and that the HMO's computer program improperly dropped it. Generalized evidence that the programs sometimes drops modifiers would not help each plaintiff in satisfying his burden of proof of demonstrating that a modifier was improperly dropped in his particular case. Furthermore, even if the plaintiffs were able to establish that modifiers were automatically dropped in particular situations not applicable to most of the 600,000 plaintiffs involved in this case (e.g., the program automatically dropped "complex" modifiers whenever the underlying procedure was a hysterectomy), such proof would be irrelevant to the large majority of doctors who had not submitted a claim for that particular procedure with the particular modifier at issue.

Similar reasoning applies to the other ways in which the HMOs allegedly breached their contracts with the fee-for-service providers, such as the defendants' alleged downcoding and denial of payment practices. While some of the capitation

claims may have been suitable for class treatment, no capitation provider subclasses were requested or certified.

This case stands in stark contrast to Allapattah, 333 F.3d 1248, in which we affirmed certification of a class of approximately 10,000 Exxon dealers who sued Exxon Corp. for breaching their dealer agreements by overcharging them for wholesale fuel purchases. The dealers alleged that Exxon had promised them that it would reduce the price of gasoline by 1.7 cents per gallon, but secretly eliminated that price reduction after a few months. Exxon challenged the district court's certification of a class of all Exxon retailers, alleging "that there were individual issues inherent in each dealer's breach of contract claim and [Exxon Corp.'s] own affirmative defenses." Id. at 1261. We rejected this argument, holding:

> Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a question common to the class, and the issue of liability was appropriately determined on a class-wide basis.

Id.

In Allapattah, Exxon cheated all of the plaintiffs in exactly the same way—by secretly eliminating its 1.7 cent-per-gallon price reduction. Once the plaintiffs proved that Exxon engaged in this behavior, each individual plaintiff's

47

breach of contract claim was substantially advanced. In light of this classwide evidence, each individual dealer could demonstrate that Exxon violated his contractual rights simply by demonstrating that he had purchased gas from Exxon during the relevant time period. Here, in contrast, classwide proof that the computer systems were programmed to sometimes cheat doctors in a variety of ways, through a variety of algorithms, does not tend to demonstrate that any particular doctor was cheated on any particular occasion, or by how much.

Roper, 578 F.2d 1106, provides an even better example of why the plaintiffs' contract claims are inappropriate for class certification, even though Roper involved claims brought under the National Bank Act, 12 U.S.C. §§ 85 and 86. In that case, the plaintiffs—over 90,000 credit card holders—contended that their credit card company charged them usurious interest rates, in violation of the National Bank Act, through its policy on when interest started accruing on certain purchases. We held that class certification was appropriate because, if the way in which the credit card company calculated interest violated applicable laws (a point we did not reach), then the billing program harmed each customer in exactly the same way; the same illegal formula was applied to each, and proof of that formula substantially advanced everyone's claims. Unlike the interest formula at issue in Roper, even if the plaintiffs here were to establish that the defendants engaged in some or all of the practices at issue, they would still need extensive individualized

proof regarding which plaintiffs have been harmed and in what ways. Cf. Kennedy

v. Tallant, 710 F.2d 711, 717 (11th Cir. 1983) (granting class certification where

the defendants "committed the same unlawful acts in the same method against an

entire class").

For these reasons, we conclude that, even though the plaintiffs' breach of

contract claims involve some relatively simple common issues of law and possibly

some common issues of fact, individualized issues of fact predominate. Cf.

Graybeal v. Am. Sav. & Loan Ass'n, 59 F.R.D. 7, 15 (D.D.C. 1973) (denying class

certification because, "while there may be questions of law or fact common to the

members of the proposed class, such questions do not predominate over those

questions affecting only individual class members"). Consequently, the district

court abused its discretion in certifying these claims for classwide treatment.

## B.

The plaintiffs' unjust enrichment claims (Count VII in the First Complaint;

Count VI in the Third Complaint) allege that the "Defendants, through the acts and

omissions described herein, are in possession of money that is the rightful property

of Plaintiffs and the class. As a result, Defendants have been unjustly enriched by

their activities." First Complaint ¶¶ 338-39. These claims require the same

extensive determinations of individualized fact as the breach of contract claims

discussed above because the facts necessary to support the two types of claims are

49

almost identical.  The major difference between these claims is not factual but legal: the obligation underlying a breach of contract claim comes most immediately from a voluntary agreement, whereas the obligation underlying an unjust enrichment claim comes directly from state law (equity).  Indeed, in this case the unjust enrichment claims are simply the way in which doctors without contracts with particular HMOs are attempting to state breach of contract-type claims against them.  Because individualized factual determinations overwhelm the common issues of fact and law that exist regarding these claims, class certification was inappropriate.

## C.

The plaintiffs' next allegation is that the defendant HMOs violated a variety of state prompt-pay statutes by failing to send doctors their reimbursements within certain statutorily established deadlines.  The most immediate problem with certifying a nationwide class for this issue is that only thirty-two states have prompt-pay statutes at all, and of those only five states expressly provide a cause of action, with courts in another six states having recognized an implied cause of action under their respective statutes.  Even assuming these claims were otherwise certifiable, the district court abused its discretion by certifying them as to a nationwide class of physicians, rather than a subclass confined to a subset of only certain states.

Even a properly restricted subclass, however, would be unable to meet Rule 23(b)(3)'s predominance requirement. There are few common issues of law because, as the defendant HMOs point out, "[s]tates define differently what constitutes a 'clean' claim for payment. States have also adopted different deadlines for making 'prompt' payment. Not surprisingly, given the heavily regulated nature of this field, there are also diverse exceptions and conditions contained in certain states' prompt pay regulations." Opening Brief of Appellants Aetna, et al., at 41-42. Because the applicable state laws are similar only in their broad contours, class certification is inappropriate.

Compounding the problem of disparate laws is the need for individualized findings of fact. The plaintiffs have failed to allege that the defendants' computer programs always delay payments for every physician, or always delay payments under a particular set of circumstances that applies to most class members. The simple fact that payments are sometimes delayed, or delayed under various sets of particular circumstances that each apply only to a small number of class members, does not give rise to any predominating common questions of fact. Even if the plaintiffs were to establish that the HMOs conspired to delay payments and that payments to physicians were sometimes delayed, that would do nothing to further any individual physician's claim that a particular reimbursement of his was actually held up improperly. Even if a class were certified for this issue, each

physician would still have to prove the same facts to make out a prima facie prompt-pay case that he would if his prompt-pay claims were being tried independently. Because there are no common questions of either law or fact that predominate with these claims, certification under Rule 23(b)(3) was improper.

D.

The defendants have failed to challenge the predominance finding implicit in the district court's certification of a California Subclass based on alleged violations of § 17200 of the California Business and Professions Code (Count IX in the First Complaint; Count X in the Third Complaint). The appellants' only mention of this provision is in a somewhat cryptic footnote stating, "In any event, the 17200 class does not provide an independent basis for certification where, as here, the federal claims giving rise to subject matter jurisdiction are not subject to class treatment." Opening Brief of Appellants Aetna, et al., at 41 n.19. Consequently, we deem this issue waived, and do not consider whether this claim satisfies the "predominance" prong of Rule 23(b)(3). See Chavis v. Clayton County Sch. Dist., 300 F.3d 1288, 1291, n.4 (11th Cir. 2002) ("[I]ssues not argued on appeal are deemed waived, and a passing reference in an appellate brief is insufficient to raise an issue.").

In conclusion, the district court abused its discretion in certifying the plaintiffs' breach of contract, unjust enrichment, and prompt-pay claims because individualized issues of law or fact predominate over common, classwide issues.

52

We do not reach whether the court should have certified a California Subclass alleging violations of the California Business and Professions Code.

IV.

The preceding Parts focused exclusively on whether common issues of fact and law stemming from the plaintiffs' federal and state claims predominate over individualized issues. We held that while the plaintiffs' federal claims satisfy this requirement, their state claims do not.[11] We now turn to whether the plaintiffs' federal claims satisfy the second prong of the Rule 23(b)(3) test—that "a class action is superior to other available methods for the fair and efficient adjudication of the [claims]." Our focus is not on the convenience or burden of a class action suit per se, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs. See In re Managed Care Litig., 209 F.R.D. 678, 692 (S.D. Fla. 2002) (noting that this factor "requires the Court to determine whether there is a better method of handling the controversy other than through the class action mechanism"); Carnegie v. Mut. Sav. Life Ins. Co., No. CV-99-S-3292-NE, 2002 U.S. Dist. LEXIS 21396, at *76-

---

[11] We also noted that the appellants failed to specifically challenge the district court's certification of a California Subclass on "predominance" grounds. Their claims regarding the "superiority" of a class action similarly ignore the California Subclass. Consequently, we need not consider this subclass at all in this appeal, and so the district court's ruling in this regard remains undisturbed (though not specifically affirmed for "law of the case" or "prior panel" rule purposes).

53

77 (N.D. Ala. Nov. 1, 2002) ("It is only when [management] difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation of individual lawsuits, that a class action is improper.") (quoting Herbert B. Newburg & Alba Conte, <u>Newburg on Class Actions</u> § 4.32, at 4-125 (3d ed. 1992)) (alteration in original).

In many respects, the predominance analysis of Part II has a tremendous impact on the superiority analysis of this Part for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims. <u>See Motel 6</u>, 130 F.3d at 1006 n.12 ("The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class."); <u>Shelley v. AmSouth Bank</u>, No. 97-1170-RV-C, 2000 U.S. Dist. LEXIS 11429, at *26 (S.D. Ala. July 24, 2000) ("[S]uperiority analysis is intertwined with predominance analysis; when there are no predominant common issues of law or fact, class treatment would be either singularly inefficient . . . or unjust.") (quotation marks omitted) (second alteration in original). Rule 23(b)(3) contains a "non exhaustive" list of four factors courts should take into account in making this determination, <u>Miles v. Am. Online, Inc.</u>, 202 F.R.D. 297 (M.D. Fla. 2001):

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]

(D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). There is no reason to believe that the putative class members in this case have any particular interest in controlling their own litigation, so the first factor does not counsel against class certification. Similarly, there are no class members separately pursuing other cases involving the same claims and parties, see In re Managed Care Litig., 246 F. Supp. 2d 1363, 1364 (J.P.M.L. 2003) (consolidating a separate lawsuit against CIGMA into this multidistrict litigation), so the second specified factor does not aid the defendants, either. The parties focus most of their discussion on the remaining two factors—the desirability of litigating these claims in a single forum, and the manageability of such a large case. We address each of these concerns in turn. We then turn to two additional arguments against class certification raised by the defendants.

A.

The first factor the parties seriously contest is whether it is desirable to concentrate this litigation in a single forum. Once the plaintiffs establish that

55

common issues of fact and law predominate over individualized issues, there are typically three main reasons why it is desirable to litigate multiple parties' claims in a single forum.[12]  First, class actions "offer[] substantial economies of time, effort, and expense for the litigants . . . as well as for the [c]ourt."  Terazosin Litig., 220 F.R.D> at 700.  Holding separate trials for claims that could be tried together "would be costly, inefficient, and would burden the court system" by forcing individual plaintiffs to repeatedly prove the same facts and make the same legal arguments before different courts.  Id.; see also Cheney v. Cyberguard Corp., 213 F.R.D. 484, 502 (S.D. Fla. 2003) ("It would be impracticable to permit individual suits by each shareholder of Cyberguard stock during the relevant class period as it is alleged that there are thousands of purchasers who have been injured by the alleged wrongful acts of the Defendants."); Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 701 (M.D. Ga. 2002) ("[E]ven if sufficient incentive existed for individual claimants to pursue their claims separately, class action treatment is far superior to having the same claims litigated repeatedly, wasting valuable judicial resources.").  Where predominance is established, this consideration will almost

_____

[12]  We reject the claim that this factor "is relevant only when other class litigation has already been commenced elsewhere."  Carnegie v. Mut. Sav. Life Ins. Co., No. CV-99-S-3292-NE, 2002 U.S. Dist. LEXIS 21396, at *75 (N.D. Ala. Nov. 1, 2002) (quoting Herbert B. Newburg & Alba Conte, Newburg on Class Actions § 4.31, at 4-124 (3d ed. 1992)).  This factor calls us to conduct a general examination of "the desirability of concentrating litigation in one forum," Pickett v. IBP, Inc., No. 96-A-1103-N, 2001 U.S. Dist. LEXIS 22453, at *33-34 (M.D. Ala. Dec. 26, 2001), regardless of whether litigation is pending elsewhere.

always mitigate in favor of certifying a class.

Second, as the Supreme Court has recognized in a related context, class actions often involve "an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit. The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually . . . ." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 813, 105 S. Ct. 2965, 2975, 86 L. Ed. 2d 628 (1985); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617, 117 S. Ct. 2231, 2246, 138 L. Ed. 2d 689 (1997) (noting that, in enacting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'") (quoting Benjamin Kaplan, A Prefatory Note, 10 B.C. Indus. & Com. L. Rev. 497, 497 (1969)); Montgomery v. New Piper Aircraft, Inc., 209 F.R.D. 221, 230 (S.D. Fla. 2002) (declining class certification in part because "there is nothing to indicate that individual owners of these aircraft will be precluded from bringing separate legal actions if they so desired"). This consideration supports class certification in cases where the total amount sought by each individual plaintiff is small in absolute terms. Cf. Managed Care Litig., 209 F.R.D. at 693 (rejecting the "[p]laintiffs' assertion that the small size of each member's claims makes class treatment appear to be the only feasible method of adjudication" because "[e]ven small individual

57

claims under RICO can be feasible given the possibility of the award of treble damages and attorneys' fees").[13] It also applies in situations where, as here, the amounts in controversy would make it unlikely that most of the plaintiffs, or attorneys working on a contingency fee basis, would be willing to pursue the claims individually. This is especially true when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings.

Third, it is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters.[14] See Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 510-11 (S.D. Tex. 2004) ("[T]he value of concentrating litigation in this forum is great as the Court has already made several rulings in this case thus far."). In this case, various individual claims were consolidated before the district court by the Panel on Multidistrict Litigation, and the court has done a fine job in addressing a wide range of pretrial motions. While such extensive work is by no means necessary for us to conclude that concentration of the claims in a class action in a single forum is desirable, in this case it is

---

[13] We hasten to add, however, that "the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high." Windsor, 521 U.S. at 617, 117 S. Ct. at 2246.

[14] The fact that a court may not yet have made any progress in dealing with a class action, however, is not a reason against certifying a class action.

58

impossible to overlook the significant efforts that have already been put into these proceedings. Consequently, the most common factors for assessing whether it is desirable for the plaintiffs' claims to be litigated in a single forum point to class certification in this case.

There are also several reasons courts commonly cite as to why it is particularly undesirable to litigate a class's claims in a single judicial forum. Perhaps most importantly, we assess whether the potential damages available in a class action are grossly disproportionate to the conduct at issue. Where the defendant's alleged behavior is deliberate or intentional, we have had no problem allowing class actions to proceed. Where defendants are being sued for statutory damages for unintentional acts under a strict liability standard, however, courts take a harder look at whether a defendant deserves to be subject to potentially immense liability. See Ratner v. Chem. Bank N.Y. Trust Co., 54 F.R.D. 412, 416 (S.D.N.Y. 1972) (declining to certify a class where a mandatory strict liability statutory penalty scheme would lead to "horrendous, possibly annihilating punishment"). Similar reasoning applies where damages are being sought for technical violations of a "complex regulatory scheme, subject to different reasonable interpretations," London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 n.5 (11th Cir. 2003). In cases where "the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff,"

we are likely to find that individual suits, rather than a single class action, are the superior method of adjudication. Id.; see also Roper, 578 F.2d at 1114 (noting our concern with "a fixed minimum penalty of a substantial amount for a technical violation that, if magnified, would exact a punishment unrelated to statutory purposes") (citations omitted).

Although RICO allows for treble damages, these are tied to the actual harm suffered by the plaintiffs; RICO does not guarantee a fixed amount of damages regardless of the gravity of the defendants' behavior. Furthermore, since RICO violations must be intentional, there is no danger that the defendants will be subject to an unjustly harsh verdict for accidental behavior. Finally, because RICO violations are predicated upon serious federal criminal acts, this is not a case where the plaintiffs are attempting to obtain a windfall based on minor or technical violations of a complex regulatory scheme. Thus, the concerns that typically mitigate against concentrating claims in a single forum do not apply in this case.

At least one district court in our circuit has suggested that, in considering whether it is desirable to have all putative class members' claims litigated in a single forum, we should consider whether the theories under which they seek relief are "immature"—that is, relatively new or innovative. In Jacobs v. Osmose, Inc., the district court held,

Class action treatment is not the superior method for handling this

matter. A mass tort such as this cannot properly be certified without a prior track record from which this Court would be able to draw the information necessary to make the predominance analysis required under Rule 23. Certification of an 'immature' tort results in a higher than normal risk that the class action may not be superior to individual adjudication. Any savings in judicial resources in this case is speculative . . . .

213 F.R.D. 607, 618 (S.D. Fla. 2003); see also Castano, 84 F.3d at 749 ("In the context of an immature tort, any savings in judicial resources is speculative, and any imagined savings would be overwhelmed by the procedural problems that certification of a sui generis cause of action brings with it.").

None of our cases has ever held the "maturity" of a tort to be a proper consideration in the certification decision. Without delving into whether the plaintiffs' claims in this case are sufficiently new or innovative to count as an "immature" tort under the Osmose standard, we reject this as a legitimate consideration in making a "superiority" determination. There is no reason why, even with so-called "immature torts," district and circuit courts cannot make the necessary determinations under Rule 23 based on the pleadings and whatever evidence has been gathered through discovery. Moreover, there is no basis in Rule 23 for arbitrarily foreclosing plaintiffs from pursuing innovative theories through the vehicle of a class action lawsuit. Particularly when the considerations discussed at the beginning of this Section would preclude most plaintiffs from individually litigating their personal claims, a class action may be the only way that

61

most people can have their rights—even "innovative" or "immature"

rights—enforced.  Furthermore, if an "immature tort" truly raises a variety of new

or complicated legal questions, then those questions constitute significant common

issues of law.  Their resolution in a single class-action forum would greatly foster

judicial efficiency and avoid unnecessary, repetitious litigation.  For these reasons,

it is desirable to litigate the plaintiffs' federal claims in a single forum.

B.

The final factor expressly specified in Rule 23(b)(3) that courts must weigh

in deciding to certify a class action is whether certification will cause

manageability problems.  See Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 273

(S.D. Fla. 2003) ("Severe manageability problems are a prime consideration that

can defeat a claim of superiority.").  This concern will rarely, if ever, be in itself

sufficient to prevent certification of a class.  "Courts are generally reluctant to deny

class certification based on speculative problems with case management."

Managed Care Litig., 209 F.R.D. at 692.  Even potentially severe management

issues have been held insufficient to defeat class certification.  See, e.g., Carnegie,

2002 U.S. Dist. LEXIS 21396, at *77 ("There is no question that this action, if

certified, would present management difficulties. . . . [T]hose management issues,

although substantial, do not counsel against certifying the class under Rule

23(b)(3)."); In re Thermagenics Corp. Sec. Litig., 205 F.R.D. 687, 697 (N.D. Ga.

62

2002) ("Certification cannot be denied because the number of potential class members makes the proceeding complex or difficult.").

In this case, the district court concluded that there were no "unsurmountable difficulties" with managing the case. Managed Care Litig., 209 F.R.D. at 696. While recognizing that "[r]eliance, causation and damages may create complications during the course of this litigation," the court found that "the potential difficulties are nowhere near the magnitude of problems that could arise from 600,000 separate actions." Id. at 696-97.

In reviewing this determination, we recall two points generally applicable throughout this "superiority" analysis. First, we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members). Second, where a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions. See, e.g., Terazosin Litig., 220 F.R.D. at 700 (certifying class because "[m]ultiple lawsuits brought by thousands of consumers and third-party payers in seventeen different states would be costly, inefficient, and would burden the court system"); cf. Shelley, 2000 U.S. Dist. LEXIS 11429, at *28 ("[T]he complexity of the individual issues weighs

further against manageability of the class action. Most if not all of the individual issues identified above would require extensive individualized examination of each class member.").

While each plaintiff must prove some individualized factual issues to support his RICO claim,

> [t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

In re Tri-State Crematory Litig., 215 F.R.D. 660, 699 n.28 (N.D. Ga. 2003) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001)).

In light of these considerations, we hold that the district court acted well within its discretion in concluding that it would be better to handle this case as a class action instead of clogging the federal courts with innumerable individual suits litigating the same issues repeatedly. The defendants have failed to point to any specific management problems—aside from the obvious ones that are intrinsic in large class actions—that would render a class action impracticable in this case.

C.

64

Moving beyond the factors enumerated in Rule 23(b)(3), the defendants offer two additional reasons why a class action is inferior to a host of individual suits in resolving these disputes. First, they maintain that "a single jury, in a single trial, should not decide the fate of the managed care industry." Opening Brief of Appellants Aetna, et al., at 45. Courts have occasionally found the impact that a class action suit could potentially have on an industry to be a persuasive reason to prohibit a class action from proceeding. In Rhone, for example, one of the reasons the Seventh Circuit granted a writ of mandamus ordering a district court to decertify a class was that, with a class action,

> [o]ne jury, consisting of six persons . . . will hold the fate of an industry in the palm of its hand. This jury . . . [may] hurl the industry into bankruptcy. . . . [This] need not be tolerated when the alternative exists of submitting an issue to multiple juries constituting in the aggregate a much larger and more diverse sample of decision-makers.

51 F.3d at 1300.

We find such reasoning unpersuasive and contrary to the ends of justice. This trial is not about the managed care industry; it is about whether several large HMOs conspired to systematically underpay doctors. The issue is not whether managed care is wrong, but whether particular managed care companies failed to live up to their agreements. The plaintiffs are seeking nothing more than the compensatory damages to which they are contractually entitled, and the treble damages to which they are statutorily entitled.

65

We have nothing but the defendants' conclusory, self-serving speculations to support their claim that this trial could devastate the managed care industry. "Because considering the financial impact of a judgment presupposes success on the merits and requires the trial court to express an opinion on the harshness Vel non of a particular remedy prior to trial itself, it ought to be allowed only in extreme cases." Roper, 578 F.2d at 1114. More importantly, however, if their fears are truly justified, the defendants can blame no one but themselves. It would be unjust to allow corporations to engage in rampant and systematic wrongdoing, and then allow them to avoid a class action because the consequences of being held accountable for their misdeeds would be financially ruinous. We are courts of justice, and can give the defendants only that which they deserve; if they wish special favors such as protection from high—though deserved—verdicts, they must turn to Congress.

D.

Second, the defendants contend that a class action creates "unfair and coercive pressures on [them]" to settle that are unrelated to the merits of the plaintiffs' claims. They point to Castano, in which the Fifth Circuit decertified a class of cigarette smokers seeking to sue tobacco companies in part because

> [i]n the context of mass tort class actions, certification dramatically
> affects the stakes for defendants. Class certification magnifies and
> strengthens the number of unmeritorious claims. Aggregation of

66

> claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards. In addition to skewing trial outcomes, class certification creates insurmountable pressure on defendants to settle, whereas individual trials would not. The risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low. These settlements have been referred to as judicial blackmail.

84 F.3d at 746 (citations omitted); accord Griffin v. GK Intelligent Sys., 196 F.R.D. 298, 305 (S.D. Tex. 2000).

The defendants also tear out of context quotes from Supreme Court cases. For example, they point out that the Supreme Court once observed that "[c]ertification of a large class may so increase the defendant's potential liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." Coopers & Lybrand v. Livesay, 437 U.S. 463, 476, 98 S. Ct. 2454, 2462, 57 L. Ed. 2d 351 (1978). What the defendants conveniently omitted from their brief, however, is the fact that Livesay had nothing to do with the standards articulated in Rule 23(b)(3); it addressed only whether class certification decisions were immediately appealable prior to the enactment of Rule 23(f). See id. at 477, 98 S. Ct. at 2462 ("[T]he fact that an interlocutory order [denying class certification] may induce a party to abandon his claim before final judgment is not a sufficient reason for considering it a 'final decision' within the meaning of § 1291.").

Mere pressure to settle is not a sufficient reason for a court to avoid

67

certifying an otherwise meritorious class action suit.  See MasterMoney Antitrust Litig., 280 F.3d at 145 ("The effect of certification on parties' leverage in settlement negotiations is a fact of life for class action litigants.  While the sheer size of the class in this case may enhance this effect, this alone cannot defeat an otherwise proper certification."); Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000) ("[N]o matter how strong the economic pressure to settle, a Rule 23(f) application, in order to succeed, also must demonstrate some significant weakness in the class certification decision.").

Indeed, settlement pressures have already been taken into account in the structure of Rule 23; such pressures were the main reason behind the enactment of Rule 23(f), which allowed the defendants to pursue this appeal in the first place. See id. at 148 ("One sound basis for granting jurisdiction under Rule 23(f) is . . . the circumstance that the class certification places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability.") (quotation marks and citation omitted); see, e.g., Isaacs v. Sprint Corp., 261 F.3d 679, 681 (7th Cir. 2001) ("If the order of certification stands, the pressure on [the defendant] to settle will be enormous.  We conclude that this is an appropriate case in which to accept a Rule 23(f) appeal and we proceed to the merits . . . .").  Having already used settlement pressure as a basis for getting into this court on interlocutory appeal, the defendants cannot continue to rely upon it as

the basis for overturning the underlying certification ruling.

Moreover, while affirming certification may induce some defendants to settle, overturning certification may create similar "hydraulic" pressures on the plaintiffs, causing them to either settle or—more likely—abandon their claims altogether. See In re Diet Drugs Prod. Liab. Litig., 93 Fed. Appx. 345, 350 (3d Cir. 2004) ("Orders granting class certification may expose defendants to enormous liability while orders denying certification may effectively eviscerate the plaintiffs' ability to recover. In such cases, the pressure to settle that is imposed on the dissatisfied party may be grave and, effectively, unreviewable."); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 165 (3d Cir. 2001) (holding that while "some of the securities claims pressed by the putative class members may be too small to survive as individual claims[,] . . . certifying the class may place unwarranted or hydraulic pressure to settle on defendants. Either way, an adverse certification decision will likely have a dispositive impact on the . . . litigation."). Because one of the parties will generally be disadvantaged regardless of how a court rules on certification, this factor should not be weighed.

V.

For the reasons articulated above, we affirm the district court's grants of class certification as to all RICO-related claims, though we urge it to reconsider the precise scope of the classes, and reverse the district court's grant of class

69

certification as to all state-law claims other than the claim based on California law. We do not disturb the district court's certification of the California Subclass because the defendants did not specifically challenge that on appeal.

Given the number of parties involved in this case, it threatens to degenerate into a Hobbesian war of all against all. Nevertheless, we feel that the district court—a veritable Leviathan—will be able to prevent the parties from regressing to a state of nature. One can only hope that, on remand, the proceedings will be short, though preferably not nasty and brutish.

SO ORDERED.