ROTHENBERG, J.
(dissenting).

INTRODUCTION

While I agree with the bulk of the majority’s opinion, I respectfully disagree with its analysis in section II.B approving the damages methodology advanced by the homeowners. The majority correctly notes that the determination regarding the proper measure of damages is dictated by the facts and circumstances of each case, *1144 Dep’t of Agric. & Consumer Servs. v. Bogorff, 35 So.3d 84, 91 (Fla. 4th DCA 2010); the “replacement cost” methodology has been approved as a measure of damages in cases where trees are removed from real property, id.; Fla. Dep’t of Agric. & Consumer Servs. v. City of Pompano Beach, 829 So.2d 928, 931 (Fla. 4th DCA 2002); Fiske v. Moczik, 329 So.2d 35, 37 (Fla. 2d DCA 1976); and these principles apply in inverse condemnation cases, Bogorff, 35 So.3d at 91; City of Pompano Beach, 829 So.2d at 931.
I do not take issue with these well supported propositions. I take issue with the damages formula crafted by the homeowners, which they contend can accurately and uniformly calculate the replacement cost of each of them 247,927 trees. As I will demonstrate below, this is simply not true. The formula is deficient as a matter of law. Accordingly, I would reverse class certification on the basis that the homeowners have failed to satisfy their burden of proffering an accurate and uniform methodology to calculate damages on a class-wide basis. See Castin v. Fla. Dep’t of Agric. & Consumer Servs., 901 So.2d 1020, 1021 (Fla. 4th DCA 2005); Execu-Tech Bus. Sys., Inc. v. Appleton Papers Inc., 743 So.2d 19, 21-22 (Fla. 4th DCA 1999); see also Klay v. Humana, Inc., 382 F.3d 1241, 1259-60 (11th Cir.2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

THE CITRUS CANKER ERADICATION PROGRAM

In November 1995, citrus canker was discovered on residential properties in Broward, Dade, and Manatee counties. Patchen v. Fla. Dep’t of Agric. & Consumer Servs., 906 So.2d 1005, 1006 (Fla.2005). “Citrus canker is a disease that is caused by citrus canker bacteria, which attack the fruits, leaves and stem of citrus plants.” Haire v. Fla. Dep’t of Agric. & Consumer Servs., 870 So.2d 774, 778 (Fla.2004). “Although the fruit of an infected tree remains edible, the disease causes defoliation, fruit drop and loss of yield, as well as blemishes on the fruit and a loss of quality.” Id.
The Florida Department of Agriculture and Consumer Services (the “Department”) was assigned the task of eradicating the citrus canker strain. Ultimately, the task would be challenging because citrus canker is “difficult to control,” as it is “spread from tree to tree primarily by wind-driven rain or the contamination of equipment or plant material.” Id. To remedy the problem, the Department established the Citrus Canker Eradication Program, pursuant to which the Department removed all citrus trees infected with or exposed to citrus canker. Initially, a tree was determined to be “exposed” to citrus canker if it was located within a 125-foot radius of an infected tree. However, the 125-foot radius proved to be “inadequate,” as “it only captured about thirty to forty-one percent of infection that spread from a diseased tree.” Id.
In March 1999, the Citrus Canker Technical Advisory Task Force, a body of regulatory individuals, scientists, and citrus industry representatives, unanimously recommended that the Department adopt a policy to destroy trees within a 1900-foot radius of a diseased tree. Id. at 779. On January 1, 2000, the Commissioner of Agriculture adopted the recommendation, and the 1900-foot buffer zone policy went into effect. Patchen, 906 So.2d at 1006; see also § 581.184(2)(a), Fla. Stat. (2002) (“The department shall remove and destroy all infected citrus trees and all citrus trees exposed to infection.”); *1145 § 581.184(l)(b), Fla. Stat. (2002) (‘“Exposed to infection’ means citrus trees located within 1,900 feet of an infected tree.”). Pursuant to this policy, the Department destroyed hundreds of thousands of citrus trees across the state.

THE CLASS ACTION

In late 2000, Miami-Dade County homeowners filed the instant lawsuit, alleging that the Department’s destruction of their healthy, uninfected residential citrus trees constituted a taking, requiring full compensation under Article X, section 6(a) of the Florida Constitution. In June 2010,[4] the trial court granted the homeowners’ motion for class certification, defining the class as:
All owners of citrus trees situated within Miami-Dade County, incorporated or otherwise, not used for commercial purposes, which were not determined by the Department to be infected with citrus canker and were destroyed under the CCEP on or after January 1, 2000....
The class is comprised of 88,630 homeowners, whose 247,927 healthy citrus trees were destroyed pursuant to the Citrus Canker Eradication Program.

THE TRIAL COURT’S CONCLUSION THAT PREDOMINANCE WAS SATISFIED

The trial court premised its determination that the homeowners satisfied the “predominance” requirement set forth in Florida Rule of Civil Procedure 1.220(b)(3) on its conclusion that “the damage methodology proposed by Plaintiffs represents a simple, straightforward and effective method for calculating the replacement cost of the destroyed trees on a classwide basis.” The trial court explained its reasoning as follows:
Mr. Hoyer explained that he will determine the replacement cost of the homeowners’ trees on the date they were destroyed by using records created by the Department which memorialize the variety, height, condition and location [5] of the Class members’ trees shortly before their destruction, and various sources of pricing information commonly utilized by professional tree appraisers. Mr. Hoyer testified that these are the same factors he uses in appraising other residential trees: tree size, species, condition and location.
[[Image here]]
Contrary to the Department’s arguments, this Court finds that the determination of compensation will not involve individualized determinations, requiring thousands of mini-trials. In any event, difference in damages will not ordinarily preclude class certification. While the amount of compensation applicable to each Class member — the replacement cost for each uninfected citrus tree destroyed — is unknown at this stage of the proceedings, the Court concludes, based on the testimony of Mr. Hoyer, that the amount of compensation will be easily calculable through the use of a simple, straightforward methodology making use of the Department’s own records as well as readily available information concerning the replacement cost of citrus trees.
(citation omitted). These findings are belied by the record. In reality, the testimony of Eric Hoyer plainly demonstrates that there is no practicable, uniform way of *1146 accurately calculating the replacement value of each of the 247,972 trees in this case.

MR. HOYER’S PROPOSED FORMULA

In devising his proposed formula, Mr. Hoyer relied on the Guide for Plant Appraisal (“the Guide”), which he admitted is the only authoritative text concerning the appraisal of trees. Mr. Hoyer acknowledged that, under the Guide, the “ideal” method for calculating the replacement cost of citrus trees is “the trunk formula method,” which prices the replacement value of a “tree based on its cross sectional area, which is related to the trunk diameter.” Mr. Hoyer, however, could not proceed under the “trunk formula method” because the Department did not collect information regarding the trunk diameters in this case.
Mr. Hoyer was thus forced to settle on one of the alternative replacement cost formulas set forth in the Guide, which requires an individualized analysis of four factors: height, species, condition, and location. According to Mr. Hoyer, however, the “species” factor is not relevant in this case, since his review of the citrus market apparently revealed that all citrus trees of comparable heights share an equal value, regardless of species.
Thus, the starting point in Mr. Hoyer’s proposed formula is height. After studying the market for citrus trees, Mr. Hoyer proposed to establish an initial value for each tree based on height, on a foot-by-foot basis.[6] The Guide would then require that the initial value be depreciated by each tree’s condition and location attributes, purportedly yielding its replacement value. As Mr. Hoyer stated:
[The height] would establish a base, what we call a basic value or replacement value for those plants, for those citrus trees. And then the value would be depreciated by the condition and the location factors. That is a subjective value determined by the appraiser.
The validity of this formula as a measure of replacement cost is of no moment[7] *1147 because Mr. Hoyer admittedly deviated from it. While the plaintiffs have data reflecting the height and general condition of each tree, they do not possess, and cannot practicably obtain, sufficient information to accurately apply a location discount to each tree in this case.
To correctly apply a location discount, the Guide requires individualized consideration of three location attributes: site; contribution; and placement.[8] On direct examination, Mr. Hoyer explained:
Well, there are three sub-parameters under location. There’s' what’s called the site, and there’s the contribution and the placement. The site is the site itself of the home, you know, the type of neighborhood that it’s in, how expensive is the home, this type of thing.
The contribution is what are individual trees, what is that tree contributing to the, to that property. Is it providing shade. Is it a buffer; that type of thing. Is it under a power line, and so on and so forth.
And the placement of the tree. Is the tree placed in such a manner that it is contributing to the property. And you take in a number of factors, there’s a lot of factors that play into that.
Unfortunately, the plaintiffs do not possess any information regarding the site, contribution, or placement of any of the trees. More importantly, Mr. Hoyer admitted that obtaining such particularized information and accurately applying the location discount to each tree would not be “practical” in a case featuring 247,972 trees spread across Miami-Dade County.
A. I didn’t have the advantage of looking at each and every property and because of the number of properties involved, it wouldn’t be practical to go through that exercise.... [W]e didn’t have much information on location. And it wouldn’t be practical to do that for a quarter of a million trees.
[[Image here]]
Q. Instead of using a 75 percent code across the board for every single tree in Dade County, instead of doing that, if *1148 you were to really make an actual assessment of the percentage location discount for a specific particular tree, but do that for every tree, that would not be a practical thing you could do?
A. Not very practical. That’s correct. Which is one of the reasons we came up with a, I came up with a generic location factor in dealing with the class here.
Mr. Hoyer’s proposed solution was to alter the formula by crafting an “across-the-board” location discount and applying it to all of the 247,972 trees, without regard to their actual location attributes. Specifically, Mr. Hoyer “came up with” a location discount multiple of .75 to be applied uniformly to each tree — in other words, a diminishment of twenty-five percent of each tree’s value after it is discounted for its condition.
So I came up with a range of location percentages; again, it’s from zero to a hundred percent, I came up with a range of location percentages that I thought would be reasonable in a class situation.
Generally speaking, there’s one to three trees on a property. In general, they’re in the side yard or back yard, you know. In general, the trees are 10 to 20 feet tall and so forth. So with that information, taking an average situation for the class, I came up with a range of about 67 to 85 percent for location value and settled on a median of 75 percent.
When asked to elaborate how he “came up with” the multiple of .75, Mr. Hoyer explained:
I just — again, an appraisal is a subjective art, and I felt that was a reasonable discount.... And because most of these trees were in the side yard or in the backyard, they weren’t necessarily a focal point of someone’s landscaping, but the trees did have value to the homeowners, as we heard earlier, I felt that was a reasonable discount.
On cross examination, counsel for the Department emphasized the obvious problems with applying a location discount in an across-the-board fashion, rather than on an individual basis.
Q. So for location ... we would be looking at the particular location on someone’s property and coding that from zero to 100 percent, right?
A. No. I used 75 percent location for all of the trees. There was no variation like there was for condition.
Q. So even though some trees may have been in a great location and some trees may have been in a terrible location, everybody gets the same?
A. Well, A, we didn’t have a location, we didn’t have much information on location. And it wouldn’t be practical to do that for a quarter of a million trees.
[[Image here]]
Q. Now the first thing the guide tells us about the location factor is that you have to rate the overall quality of the general area, and of the buildings, landscape structures and plantings of the site. Right?
A. Yes, I said that before.
Q. That’s going to vary from neighborhood to neighborhood in Dade County, isn’t it?
A. Oh, yes. Absolutely.
Q. Number two, rate the contribution of the plant in providing each of the functional and aesthetic benefits identified.
A. Yes, I said that.
Q. So that is very specific to an individual property, isn’t it?
A. Yes.
Q. Number three, rate how effectively the placement of the plant provides its *1149 functional and aesthetic benefits. Again, it’s very specific to the property, isn’t it?
A. Yes, I mentioned site contribution and placement earlier.
Q. So of the three factors here, number one is specific to the neighborhood, and number two and three are specific to the particular lot?
A. Yes.
Q. And you’re just going to use one location factor exactly the same for every single lot in Miami-Dade County we’re dealing with?
A. Well, I had to make modifications, based on a quarter million trees. There has to be some practical way to do this on a class basis.
Mr. Hoyer also admitted that applying an across-the-board location discount would under-compensate some class members and over-compensate others.[9] Nevertheless, Mr. Hoyer found solace in the fact that “it would probably not have an impact in the total amount of compensation” the class, as a whole, would receive, or the Department would have to pay, “because it would average out.”

LEGAL ANALYSIS

A trial court’s order certifying a class is reviewed for an abuse of discretion. Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 102-03 (Fla.2011). However, in this case, the trial court premised its certification of the class on its acceptance of the plaintiffs’ damages methodology, the validity of which we review de novo. R & B Holding Co. v. Christopher Adver. Grp., Inc., 994 So.2d 329, 331 (Fla. 3d DCA 2008) (“Determining whether a particular methodology is a proper method for computing damages is a question of law.... The appropriate measure of damages, as compared with the amount of damages awarded, involves a legal question reviewable on appeal.”).
The takings provision of the Florida Constitution dictates that “[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.” Art. X, § 6(a), Fla. Const. “The constitutional requirement of full compensation means that the landowner must be completely paid for that which is taken, and compensated for the whole loss occasioned by the taking.” Polk, 568 So.2d at 41 (quoting Dep’t of Transp. v. Nalven, 455 So.2d 301, 307 (Fla.1984)). Accordingly, the damages methodology employed in any inverse condemnation suit should be consistent with the doctrine of compensatory damages, the purpose of which is “to restore the injured party to the position it would have been [in] had the wrong not been committed.” Engle v. Liggett Grp., Inc., 945 So.2d 1246, 1279-80 (Fla.2006) (quoting Laney v. Am. Equity Inv. Life Ins. Co., 243 F.Supp.2d 1347, 1354 (M.D.Fla.2003)); see also R.J. Reynolds Tobacco Co. v. Townsend, 90 So.3d 307, 310 (Fla. 1st DCA 2012) (quoting Mercury Motors Exp., Inc. v. Smith, 393 So.2d 545, 547 (Fla.1981) (“The purpose of compensatory damages is ‘to make the injured party whole to the extent that it is possible to measure his injury in terms of money.’”)).
As the law has long recognized, “all land is considered unique,” both in terms of its physical characteristics and intended uses. Bermont Lakes, LLC v. Rooney, 980 So.2d 580, 586 (Fla. 2d DCA 2008). Thus, “[i]n takings cases, ‘the proper valuation meth *1150 od or methods for any given case are inextricably bound up with the particular circumstances of the case.’” Bogorff, 35 So.3d at 91 (quoting Department of Agriculture and Consumer Services v. Mid-Fla. Growers, Inc., 570 So.2d 892, 895 (Fla.1990)); City of Pompano Beach, 829 So.2d at 931; see also Dade Cnty. v. Gen. Waterworks Corp., 267 So.2d 633, 639 (Fla.1972). Florida appellate courts have approved of a variety of damages methodologies in cases where trees are removed from real property, including those quantifying compensatory damages based on: the diminution in the value of the real estate, Nat’l Rating Bureau, Inc. v. Fla. Power Corp., 94 So.2d 809, 811 (Fla.1956) (en banc); Watson v. Jones, 160 Fla. 819, 36 So.2d 788, 788-89 (1948); Elowsky v. Gulf Power Co., 172 So.2d 643 (Fla. 1st DCA 1965); Clark v. J.W. Conner & Sons, Inc., 441 So.2d 674, 676 (Fla. 2d DCA 1983); the cost of replacing the trees, Bogorff, 35 So.3d at 91; City of Pompano Beach, 829 So.2d at 931; the loss of “creature comforts” provided by the trees, including shade and fruit, Watson, 36 So.2d at 788-89, Elowsky, 172 So.2d at 645; Clark, 441 So.2d at 676-77; and even the loss of “prospective net revenues” the citrus trees would have produced if allowed to reach maturity, Polk, 568 So.2d at 43.
In rule 1.220(b)(3) class actions, the damages methodology advanced by the plaintiffs is relevant to a court’s analysis of “predominance.” Among other requirements, plaintiffs seeking certification under rule 1.220(b)(3) must demonstrate that “the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class.” Fla. R. Civ. P. 1.220(b)(3). “The predominance requirement is similar to commonality because ‘both require that common questions exist,’ but the ‘predominance requirement is more stringent since common questions must pervade,’ rather than merely exist.” Miami Auto. Retail, Inc. v. Baldwin, 97 So.3d 846, 855 (Fla. 3d DCA 2012) (quoting Wyeth, Inc. v. Gottlieb, 930 So.2d 635, 639 (Fla. 3d DCA 2006)). The law is clear that in cases where common issues “break down into individual factual and legal issues,” common issues do not predominate. Morgan v. Coats, 33 So.3d 59, 66 (Fla. 2d DCA 2010).
As the majority notes, individualized questions relating to damages, as opposed to liability, generally do not preclude a finding that common issues predominate. Ouellette v. Wal-Mart Stores, Inc., 888 So.2d 90, 91 (Fla. 1st DCA 2004). However, Florida courts have recognized two limiting principles in this context. First, plaintiffs bear the burden of proffering an accurate damages methodology that can be applied uniformly to each member of the class. See Castin, 901 So.2d at 1021 (holding that “the trial court did not abuse its discretion in denying class certification, because the evidence showed no reasonable methodology for generalized proof suitable for a class action”); Appleton Papers, 743 So.2d at 21-22 (affirming the trial court’s determination that the appellants failed to show predominance because “the issue of damages and impact in the case simply ‘does not lend itself to [a mechanical calculation] but requires separate mini-trials, of an overwhelming large number of individual claims’ and that ‘the staggering problems of logistics thus created make the damage aspect of the case thus predominate .... ’ ”); see also Klay, 382 F.3d at 1259 (quoting In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. 672, 698 (S.D.Fla.2004) (noting that plaintiffs must “come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis,” *1151 and that “[i]n assessing whether to certify a class,” the court must consider “whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all”)); see also Sosa, 73 So.3d at 113 (determining that predominance was strengthened because “any variance in damage recovery between the class members is calculable by using a systematic formula”). Second, Florida Courts have held that “[c]lass certification becomes inappropriate ... when the need to prove damages on an individualized basis will play such a predominant role in the litigation as to significantly outweigh any benefits to be gained by a class action lawsuit.” Equity Residential Props. Trust v. Yates, 910 So.2d 401, 403 (Fla. 4th DCA 2005) (emphasis added); see also Klay, 382 F.3d at 1260 (noting that there are “extreme cases in which computation of each individual’s damages will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable”).
In this case, the trial court determined that predominance was satisfied based on its conclusion that the plaintiffs’ proposed damages methodology “represents a simple, straightforward and effective method” for calculating the replacement cost of “each” tree on a classwide basis. While the methodology may represent a simple and straightforward method, it certainly does not represent an “effective” method. The methodology’s across-the-board application of a location discount, by definition, ignores crucial individual characteristics— the site, contribution, and placement— bearing on the value of each tree, and thus does not provide an accurate assessment of the replacement value of each tree. Consequently, the plaintiffs have failed to proffer an accurate damages methodology that can be applied uniformly to each member of the class.
Without a methodology capable of accurately and uniformly calculating the replacement cost of each tree, the “need to prove damages on an individualized basis will play such a predominant role in the litigation as to significantly outweigh any benefits to be gained by a class action lawsuit.” Yates, 910 So.2d at 403. As Mr. Hoyer stated, obtaining information regarding the site, contribution, and placement of each tree, and correctly factoring these characteristics into each replacement cost assessment, would not be practical in this case.
I didn’t have the advantage of looking at each and every property and because of the number of properties involved, it wouldn’t be practical to go through that exercise.... [W]e didn’t have much information on location. And it wouldn’t be practical to do that for a quarter of a million trees.
Doing so would require a tree appraiser or appraisers to travel to at least 83,630 homes, which are spread across Miami-Dade County, and make individualized assessments regarding the location attributes of 247,927 trees that are no longer there, all while ensuring uniformity in such evaluations. The plaintiffs would then bear the burden of proving the accuracy of each of these assessments.
As Mr. Hoyer candidly admitted, the very reason he “came up with” the methodology was to manufacture predominance so as to avoid the burdensome, individualized assessments necessary to accurately calculate and prove the replacement cost of each tree.
Q. Instead of using a 75 percent code across the board for every single tree in Dade County, instead of doing that, if you were to really make an actual assessment of the percentage location discount for a specific particular tree, but *1152 do that for every tree, that would not be a practical thing you could do?
A. Not very practical. That’s correct. Which is one of the reasons we came up with a, I came up with a generic location factor in dealing with the class here.
[[Image here]]
Q. And you’re just going to use one location factor exactly the same for every single lot in Miami-Dade County we’re dealing with?
A. Well, I had to make modifications, based on a quarter million trees. There has to be some practical way to do this on a class basis.
Accuracy, however, cannot be so blatantly sacrificed in the name of judicial economy. The litigation process demands more precision than that offered by the plaintiffs in this case.
Finally, Mr. Hoyer acknowledged that his across-the-board treatment of trees in this case would under-compensate many of the class members.[10] Nevertheless, he attempted to justify the methodology by opining that the overall compensation provided to the class as a whole would likely average out, and that, consequently, the Department would not be overcharged in damages. Mr. Hoyer’s justification is legally without merit. As stated by the Florida Supreme Court, in an action seeking damages for the wrongful cutting of trees, “the rule of damages adopted should be such as to more carefully guard against failure of compensation to the injured party than against possible overcharge upon the wrongdoer.” Watson, 36 So.2d at 789 (citing Gilman v. Brown, 115 Wis. 1, 91 N.W. 227, 229 (1902)).
In sum, the plaintiffs have failed to proffer a damages methodology capable of accurately and uniformly calculating the replacement cost of each of the 247,927 trees in this case. A careful review of the record demonstrates that “the proposed methods [for computing damages] are so insubstantial as to amount to no method at all.” Klay, 382 F.3d at 1259. Without a proper methodology, class treatment in this case is improper because the “need to prove damages on an individualized basis will play such a predominant role in the litigation as to significantly outweigh any benefits to be gained by a class action lawsuit.” Yates, 910 So.2d at 403.
Accordingly, I would reverse the trial court’s order certifying the class.

. The ten year delay was the result of procedural issues that are not relevant to my analysis.

. Contrary to the trial court's finding, the Department’s records do not contain information regarding the location of the trees.

. Mr. Hoyer testified that he was forced to “extrapolate” an initial value for trees over eight feet tall because there were no citrus trees over eight feet tall available in the citrus market. In my view, this calls into question whether replacement value is the correct measure of compensatory damages for citrus trees above eight feet tall.
In Polk, the Florida Supreme Court determined that "when there is no market [for a growing crop] at the time of the taking due to the crops’ partial state of development, it is necessary to consider other evidence bearing on value.” Dep’t of Agric. & Consumer Servs. v. Polk, 568 So.2d 35, 42 (Fla.1990). In that case, for instance, the Court concluded that because there was no market for immature citrus trees, it was proper for the jury to consider "the prospective net revenue which could have been derived from the crop at maturity [a]s a proper measure of valuation.” Id.
The principles set forth in Polk are applicable here. Because there is no market for citrus trees over eight feet tall, such trees cannot be replaced. It follows that the damages incurred by homeowners who lost trees over eight feet tall should not be measured by replacement cost. As in Polk, "it is necessary to consider other evidence bearing on value.” Id.

. I have serious reservations about factoring a tree’s location into a replacement cost analysis. The goal of the replacement cost methodology is to provide the landowners sufficient compensation to replace their trees with similar ones. It follows that the focus should be on each tree’s physical characteristics, which can be compared to those of trees available in the marketplace and priced accordingly. There is no association between a tree's location and the amount of money it would cost to replace it. The record reflects that the trial court initially shared my reservations, as evidenced by the following exchange:
THE COURT: But replacing a ten-foot average tree is going to cost you X whether it’s in the side yard, front yard or backyard. If it’s the replacement cost, it doesn’t ap *1147 pear to me that location would be an appropriate consideration.
THE WITNESS: I understand. And again, I debated that question going through this process, and because the Guide for Plant Appraisal considers ... the size, the species, the condition and location of the tree, I wanted to use a defensible methodology and follow the appraisal methodology through as outlined in the Guide, so I went ahead and used the location value.
[[Image here]]
THE COURT: Before we go there, if we’re talking about diminution to the real estate, I can understand location being a significant factor. If we’re talking about replacement cost, you explain to me why I would consider that at all.... It just doesn't appear to the Court that it’s an appropriate consideration.... It seems to me, replacement value is X. It’s going to cost me X to replace this 10-foot tree.... How can you replace it for less ... ?

. Mr. Hoyer illustrated the importance of a tree’s individual location attributes with the following example:
[Ljet’s say you have this beautiful large Poinciana tree in the front of your house and it’s the focal point of your house, it blooms every summer, and everybody oohs and aahs as they drive by, it's the central point of your landscaping. If I were to appraise that tree, I would give it a much higher location value than if that tree were stuck in the corner of your yard and didn't ... have the aesthetic ... [or] visual appeal, and didn't contribute as much to the overall landscaping of your property.
So if that tree were stuck in the side yard, ... [or] if you had a hundred trees in your yard and you lost that one tree, I wouldn't give it the location value that I would give it if that was the only tree in your yard, it was the focal point of your landscaping and you lost it. It would have ... more of a significant impact.

. In reality, every class member would be undercompensated by the application of the location discount because, as I explained above, a tree’s location has no bearing on the amount of money it would cost to replace it.

. As I explained above, the methodology would actually under-compensate every class member.