E. GRADY JOLLY, Circuit Judge,
joined by EDITH H. JONES and EDITH BROWN Clement, Circuit Judges, and joined, as to Parts IB and II, by PRISCILLA R. OWEN, Circuit Judge, dissenting:
The majority concludes that the plaintiffs do not need to make any showing of reliance to establish proximate cause under RICO. Citing the Supreme Court’s decision in Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), and this circuit’s recent decision in Allstate Insurance Co. v. Plambeck, 802 F.3d 665 (5th Cir. 2015), the majority opinion holds that the plaintiffs have satisfied Rule 23’s predominance requirement for RICO proximate cause simply because the plaintiffs have made a sufficient showing that Ignite is an illegal pyramid scheme, and that they lost money by investing. The majority thus asserts that, the plaintiffs do. not need to show that the defendants made any false representation upon which the plaintiffs relied to make their losing investment.
I.
A.
First, the majority errs in its cavalier disregard of evidence of individualized knowledge among the class members. The majority concludés that the plaintiffs have met Rule 23’s predominance inquiry with respect to causation under RICO simply because" there is evidence suggesting Ig- *647 rate was a pyramid scheme.- In reaching this holding, the majority opinion ignores that, from the outset of their involvement with Ignite, the plaintiffs were provided all the information needed to warn investors of Ignite’s likely illegality.
Again, there is no quarrel here with the majority opinion’s simple assertion that reliance is not a prerequisite for proving proximate cause under RICO.[1] The facts of this case, however, do not allow for such a glossy approach to class certification. The majority’s reasoning has force only to the extent that the plaintiff-investors were actually unaware of Ignite’s fraudulent structuring. See Bridge, 553 U.S. at 658-59, 128 S.Ct. 2131 (stating that, although first-party reliance is not a formal element of a RICO claim, proximate cause fails where there is evidence that the aggrieved party or an intermediary knew of the fraud, because such knowledge acts as an “intervening cause breaking the chain of causation between petitioners’ misrepresentations and respondents’ injury”); see also Sandwich Chef of Tex., Inc. v. Reliance Nat’l Indem. Ins. Co., 319 F,3d 205, 218-19 (5th Cir. 2003) (recognizing that knowledge, which is actually a defense to causation, is a relevant consideration when addressing class certification). Moreover, as both parties concede, for the purposes of proximate causej it does not matter whether Ignite actually is a pyramid scheme. Instead, the relevant inquiry is whether there are class members who understood Ignite was likely to be a pyramid scheme, but invested anyway. If so, the line of causation becomes too tenuous to maintain through common evidence solely based on the contention of Ignite’s alleged illegality.
The majority opinion takes for granted that no individualized issues of knowledge exist among the plaintiff class, asserting that “the record is devoid of evidence that a single putative class member joined [Ignite] despite having knowledge of the fraud.” It adopts this ■ position notwithstanding that the plaintiffs, by their own admission, were provided the information that Ignite was likely an illegal pyramid scheme. The record shows that the tell-tale signs of an illegal pyramid scheme were disclosed to the plaintiffs in the documents they were provided before signing up for Ignite. Ignite’s business plan, published to potential investors, openly preached recruiting additional IAs over selling Ignite’s *648 purported product, residential energy.[2] Similarly, Ignite’s published compensation scheme, which the plaintiffs do not dispute is accurate and was provided to all investors, . also bears, all the hallmarks of an illegal pyramid scheme. For example, Ignite paid only fifty cents in commission to new IAs per each energy customer they enrolled. In contrast, those IAs that were higher up in the pyramid structure received the. bulk of profit resulting from the sale of residential energy. This mark, of course, is a defining trait of a pyramid scheme, but it is also a trait that the plaintiffs themselves assert was made obvious to Ignite’s investors from the outset.
In their en banc briefing, the plaintiffs themselves repeatedly urge that anyone could see that the only realistic way to make money as an Ignite IA was to recruit new IAs to work underneath you, and to teach those new IAs to do the same. The plaintiffs emphasize that common sense compels the conclusion that Ignite’s business model was illegal from the outset, since the unsustainability of such a scheme is apparent on its face; eventually, there are no more new' IAs to recruit. According to the plaintiffs, “[a]ny ‘energy company’ sales program that is ‘not about becoming an energy salesperson’ necessarily collapses; if everyone tries to succeed by ‘duplicating[1] a huge class is inevitably left with a loss when the recruits run out.” Appellees’ Supplemental En Banc Brief at 7, Taking the plaintiffs at their own emphatic word, it follows that the class members who took minimal time to read the investment materials would have developed serious concerns about Ignite’s risk and illegality. Still, they invested. The plaintiffs, however, contend, in contradictory fashion, that these overt “buyer beware” warnings were insufficient to put even a single plaintiff on notice that Ignite was actually an illegally structured venture. At the very least, these warnings were sufficient to cause the prudent investor to question Ignite’s business structure before blindly investing.
It is true that our caselaw, of course, does not require an investor to comb through the finest details of a defendant’s business plan to preserve a later claim for fraud. But it does, however, require that a plaintiff-investor do some minimum amount of research into the nature of an investment opportunity before signing up, losing money, and crying fraud. See Martinez Tapia v. Chase Manhattan Bank, N.A., 149 F.3d 404, 409 (5th Cir. 1998) (“The investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the nature of his investment and associated risks.... [T]he party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud and cannot close his eyes and simply wait fqr facts supporting such a claim to come to his attention.”).
In addition to the investment documents, a cursory Google search would have led the plaintiffs to a Dallas Morning News article, published during the time frame relevant to class certification, in which an economic expert expressly stated that Ignite was an illegal pyramid scheme, destined to result in a loss of money for most of its investors. Indeed, the plaintiffs themselves refer to this article in their complaint, but still contend that there is no sound basis to conclude that at least part of the class members were aware that *649 Ignite was thought to be an illegal venture, but chose to “take their chances” and sign up anyway.
Standing on its own, the evidence above is enough to undermine the notion that all 200,000-plus members of the putative class were unaware that Ignite had all the indi-cia of an illegal pyramid scheme..But this is not the extent of the evidence suggesting knowledge of the defendants’ fraud, which the plaintiffs now allege was a surprise. In fact, there is significant evidence that. Ignite’s own promoters, when talking to potential investors, were explicit about the company’s dubious structuring. The defendants routinely held large, revival-style recruitment, events, where Ignite executives and promoters explained Ignite’s business model. Although each recruiter’s style differed, there was a common theme in their presentations: Ignite offered potential IAs a great opportunity to make money, albeit through, recruiting other IAs instead of through actual sales. Indeed, one promoter, Randy “the ' Cowboy” Hedge, told a crowd of potential investors that, to scare off the faint of heart, he would sometimes refer to Ignite as a “pyramid” deal, Hedge suggested that he did this because he knew that those people who remained interested in joining Ignite, even after hearing the alarm-sounding de: scriptive “pyramid” applied to its business model, were chiefly concerned about making money, and not about the details of Ignite’s structuring.[3]
The majority opinion dismisses this evidence of individualized knowledge by deeming it too speculative. Citing a four-decade-old order from the Federal Trade Commission, published when pyramid schemes were still a relatively new form of potential fraud, the majority urges that pyramid schemes are “inherently deceptive,” to the extent that unsophisticated consumer-investors could not possibly discern whether Ignite’s business model was illegal before joining up. What is implied by this statement is that a multilevel marketing scheme that, at first glance, bears the indicia of legality may, upon deeper investigation, reveal subtleties of its structuring that actually make it an illegal pyramid scheme. Such subtleties, however, are entirely absent from this case. Indeed, as discussed above, all the evidence necessary to conclude Ignite was a pyramid scheme was provided to the class members and they still chose to invest; moreover, at least a number of the-plaintiffs were exposed to recruitment pitches that emphasized Ignite’s pyramid character. This evidence, even if thought not to be conclusive on whether most plaintiffs knew of the likelihood that Ignite was- an illegal pyramid scheme, is far more than “speculative.” At the very least, the defendants are entitled to probe these plaintiffs’ understanding of the Ignite investor documents *650 and accompanying sales pitches, in an effort to challenge the plaintiffs’ supposed naiveté of Ignite’s unsustainability. Accordingly, these lingering problems of individualized knowledge among many of the class preclude a finding that, consistent with the meaning and requirements of Rule 23, common issues predominate with respect to proximate cause under RICO. See Sandwich Chef, 319 F.3d at 220.
B.
Next, given that the evidence discussed above raises concerns of individualized knowledge, the majority errs in placing the burden regarding the appropriateness of class certification with the defendants, instead of the plaintiffs. The majority opinion asserts that, even assuming there is record evidence showing an indeterminate number of plaintiffs knew of Ignite’s illegality, the record evidence fails to show that individualized issues of knowledge will actually undermine those issues common to the class. The majority opinion points out that knowledge is an affirmative defense, which the defendants must raise and prove at trial. According to the majority, the fact that a “few” plaintiffs might be “picked off’ because of issues of individualized knowledge does not defeat class certification, so long as issues common to the class continue to predominate over the “outliers.”
There is no questioning that, as a general proposition, a class may be certified even when a few stray issues of individualized knowledge remain among the class’s members. It is certainly correct that Rule 23 requires a predominance of common issues, not a uniformity of them. More relevant here, however, is that Rule 23 also requires that the plaintiffs, not the defendants, carry the burden of establishing whether class certification is appropriate under Rule 23; the plaintiffs must do so by showing that individualized inquires will not cast a shadow over those issues common to the entire class. See Wal-Mart Stores v. Dukes, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011)'. This burden includes showing that a defendant’s proffered affirmative defense, if based on individualized issues of knowledge, applies only to an insignificant segment of the putative class. See Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 329 (5th Cir. 2008). (“An affirmative defense is not per se irrelevant to the predominance inquiry, as the parties seem to believe. We have noted that the predominance of individual issues necessary to decide an affirmative defense may preclude class certification.” (internal citation and quotation marks omitted)); Sandwich Chef, 319 F.3d at 220 (stating that Rule 23 requires that the district court’s predominance inquiry account for any individual issues of knowledge that will be “components of defendants’ defense against RICO fraud.”).
The plaintiffs, however, disregard this burden under Rule 23. Importantly, the plaintiffs do not even attempt to show that the defendants’ proffered defense of individualized knowledge applies only to an insignificant number of plaintiffs. Instead, they argue that a lack of knowledge may be presumed, because no “rational” individual would ever participate in an illegal pyramid scheme. Again, this theory— which, at different points in this case’s history, the plaintiffs have referred to as the “fraud-on-the-market” theory, the “rational economic actor” theory, and the “inferred reliance” theory—is the only basis upon which the district court granted class certification.[4] It follows that, if such a theo *651 ry were accepted in error, individualized issues of knowledge overwhelm those issues common to the class, rendering this class action unfit for certification. The plaintiffs, however, did not even confront the evidence suggesting individualized knowledge; instead, as stated, they chose to seek an inference of reliance—and hence, an inference that all of the plaintiffs lacked knowledge of Ignite’s illegality— based solely on an “implicit” misrepresentation, made by virtue of Ignite’s mere existence.
As discussed below, the plaintiffs’ theory of “inferred reliance” is both logically strained and is belied by the absence of any actual misrepresentation on behalf of the defendants. Ultimately, however, it does not matter whether reliance is required to establish RICO proximate cause; even if no showing of reliance is necessary, superseding issues of individualized knowledge cloud the waters of RICO causation. Accordingly, the plaintiffs have failed to meet their burden, under Rule 23(b)(3), of showing that,common issues predominate with respect to RICO’s proximate cause element.
II.
Let us now turn to the majority’s alternative holding regarding the appropriateness of an inference of reliance in this case. The majority opinion asserts that, assuming reliance on a misrepresentation must be shown to establish RICO causation, the plaintiffs have done so through common evidence. The plaintiffs, however, do not point to any common, specific misrepresentation upon which they relied, much less offer evidence demonstrating reliance. Instead, they seek an “inference” of reliance on an “implicit” misrepresentation. The plaintiffs contend that, simply by seeking to recruit new customers and investors, Ignite' falsely held itself out as a legitimate business opportunity. They further assert that, because the legality of Ignite’s business structure would have been a bedrock assumption of any reasonable investor, the court may infer that the plaintiffs relied on this implicit misrepresentation when choosing to join Ignite.[5] In arguing that an inference is appropriate here, the plaintiffs point to a handful of circuit-level cases that have allowed a class-wide inference of reliance under certain circumstances: CGC Holding Company, LLC v. Broad & Cassel, 773 F.3d 1076 (10th Cir. 2014), In re U.S. Foodservice Inc. Pricing Litigation, 729 F.3d 108 (2d Cir. 2013), and Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004).
These cases are distinguishable. Both Foodservice and Klay allowed a jury to “infer” reliance when the false representations at issue were straightforward misstatements of an amount owed or paid on a bill or invoice. Those courts concluded that a jury could infer reliahce because an individual’s payment of a bill or acceptance of a payment was, in effect, an acknowledgment of reliance oh the correctness of the amount in the bill or payment. This reliance makes sense, as no rational economic *652 actor would knowingly pay extra for nothing. CGC Holding also involved a scenario where the plaintiffs were purchasing a worthless product; they were applying for loans and paying a nonrefundable fee to the defendants, even .though the defendants had already decided that they would eventually deny the plaintiffs’ loan applications. Indeed, every single case, cited by the plaintiffs or the district court, where an “inference of reliance” was used to establish RICO causation involves allegations of a palpable, specific misrepresentation.[6]
The plaintiffs here, however, seek a wholly novel application of the inferred reliance theory. They urge the court to conclude that, as a matter of law: No rational person would ever knowingly invest in a business venture that could be illegal. Such an implausible argument ignores that, even if Ignite was a pyramid scheme, it allowed IAs the chance to make money. By the plaintiffs’ own admission, roughly 10-15% of investors made a profit over the time frame relevant to this litigation. Unlike the “something-for-nothing” transactions that, served as the basis,for an inference of reliance in the other circuit-level decisions, a person could rationally invest in a pyramid scheme with the hope that Jie or she might profit significantly, notwithstanding knowledge that a majority of participants will likely be losers. As for the majority’s altruistic suggestion that an inference of reliance is appropriate because no rational individual would ever knowingly chance defrauding others in an effort to make money for herself, I respectfully suggest that our criminal docket demonstrates the error of this assumption.
There is no attempt here to defend the legality of the defendants’ alleged pyramid scheme. The point is that the plaintiffs cannot maintain this class action as it has been structured and presented to the court. The plaintiffs do not allege, much less offer any common evidence, that the defendants misrepresented any aspect of its business structure; nor do they allege that the defendants misrepresented the plaintiffs’ likelihood of being able to sign up enough customers or downline recruits to make a profit. One is blind to reality to assume perfunctorily that approximately 200,000 IAs, pitching this scheme to each other and among themselves, were predominantly motivated only by an implicit, unspoken representation that Ignite was a “legal business opportunity.” Given the lack of an actual misrepresentation, coupled with the fact that the plaintiffs had all the information necessary to know that Ignite was a risky pyramid scheme, the plaintiffs’ theory of reliance is ill-adapted and out of place. Without this inference, the plaintiffs do not offer any common evidence with respect to proximate causation under RICO. Thus, the class should be decertified for failure to meet Rule 23’s predominance requirement.
III.
To sum up: the majority opinion allows the plaintiffs to overcome Rule 23’s predo *653 minance inquiry with respect to RICO causation, even -though all of the plaintiffs were provided the information to understand the risk that Ignite was an illegally structured enterprise. Moreover, at least part of the class was warned of the risk of investing in Ignite by the defendants’ own promotional representatives. It is impossible rationally to presume that, out of 200,-000-plus investors, a significant number of the class were not aware of the precise character of their investment.
The majority opinion dilutes both RICO’s causation requirement and Rule 23’s predominance requirement to the point that they have little relevance in cases based on allegations of a pyramid scheme. Indeed, if the court finds class certification appropriate here—in a case with over 200,000 putative class members, all of whom learned about Ignite at different times and through different channels of communication, and undoubtedly held different levels of knowledge about the company’s business, plan—it is difficult to see when individualized issues among class members would preclude certification under Rule 23.
Accordingly, I respectfully dissent.

. However, the plaintiffs' brief accompanying their motion for class certification concedes, on numerous occasions, that some degree of reliance is still necessary to sustain a RICO claim, even following Bridge, See, e.g., Doc. 134, at 9 n.13 ("The Supreme Court cautioned [in Bridge] that ‘someone’ must have relied bn the misrepresentations for the [plaintiffs] to prove the ‘by reason of' RICO language— Third-person reliance of any kind is sufficient to meet the Bridge standard.”); see also id. at 12-13 ("Proximate cause here is very simple and requires no individualized proof; it is akin to a fraud-on-the market scheme in which common sense provides the natural and straightforward inference that the enticement to invest was acted on by the purchasers of the worthless product.”); id. at 13 ("Here, 274,000 people acted on the representations made by the Defendants on the SGE website and in countless ‘business representations’ that the ‘business opportunity' presented a lucrative financial opportunity. Proof of reliance is contained in the proximate cause.”). These comments are telling of the inconsistent, shifting character of the plaintiffs’ causation arguments. Throughout this litigation, the plaintiffs have leaned primarily, if not exclusively, on their theory of "inferred reliance.” Their briefing included only passing, vague statements suggesting the opposite. Now, after downplaying the “no reliance needed” theory of proximate cause before the district court and the three-judge panel, the plaintiffs revive it as their principal' argument in these en banc proceedings. In doing so, the plaintiffs move the goal posts on both the defendants and this court.

. The Ignite business plan states “[fortunately, [Ignite] is not about becoming an energy expert or salesperson. You need only a few customers to be successful,” Similarly, an Ignite PowerPoint slide, reproduced in the instructional materials handed out to new IAs, instructs IAs to enroll only "a few customers,” and to then teach downline IAs to “do the same.”

. See Audio Recording 207.16. This "pyramid deal" reference was not as a stray remark. See id, (Hedge, when referring to allegations that Ignite is a pyramid scheme: "Hey look, have any of y’all heard that? Has anyone .ever .., Let’s get something straight—I don’t care if you call it an octagon, parallelogram, rectangle—they’re sending me a check.”); Audio File 207.3. (“Let’s be honest,. I don’t know what you do, but I guarantee you there’s somebody above you who does less and makes more, yes? You're in a pyramid [in tone of a doubter]. Hey, if you’re married, if you’re married you’re in a pyramid, and she’s on the top. You can call it a hexagon, octagon, rectangle, circle, oblong, I don't care! Pay me!”). Other promoters, although perhaps not as brazenly as Hedge, regularly emphasized in their speeches that the only way to make money as an Ignite IA was to minimize selling energy in favor- of recruiting down-line IAs. See Recording ■ of Ignite. Executive Greg .McCord, Audio File 627571 ("How do you make money [as an IA]? Well, if you keep concentrating on customers, you won’t make money. It’s the end of story.”).

. See Dist. Ct. Doc. 169 at 15 ("To the extent the plaintiffs seek 23(b)(3) certification based *651 on a fraud-on-the-marlcet theory and the common sense inference that independent associates ["IAs”] were duped into joining a pyramid scheme, the Court finds that the class can be certified.”); see also id. at 15 n.13 ("[A]ll the class members are presumed to be relying on the same misrepresentation—that the Ignite business opportunity was a legal, non-fraudulent venture.”).

. As I have already indicated, although cast as an inference of "reliance,” the plaintiffs’ theory doubles as a means of inferring that all of the class members lacked knowledge of Ignite’s likely illegality, since, according to the plaintiffs, no rational economic actor would ever pursue a fraudulent business opportunity.

. See, e.g., Rikos v. Procter & Gamble Co., 799 F.3d 497 (6th Cir. 2015) (defendant falsely advertised its dietary supplement as promoting digestive health when it, in fact, had no such effect); Negrete v. Allianz Life Ins. Co. of N. Am.., 287 F.R.D. 590 (C.D. Cal. 2012) (defendant induced class members to purchase deferred annuities by means of misleading statements and omissions regarding the value of those annuities); Minter v. Wells Fargo Bank, N.A., 274 F.R.D. 525 (D. Md. 2011) (defendant was a mere front organization formed to circumvent legislation designed to prevent market-distorting business practices within the real estate settlement services industry); Chisolm v. TranSouth Fin. Corp., 194 F.R.D, 538 (E.D. Va. 2000) (defendants conspired with one another in a "churning” scheme to defraud consumer used-car purchasers).